

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-18-2008

# USA v. Stevens

Precedential or Non-Precedential: Precedential

Docket No. 05-2497

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Stevens" (2008). *2008 Decisions.* Paper 757.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/757

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 05-2497

———————

UNITED STATES OF AMERICA

v.

ROBERT J. STEVENS,

<u>Appellant</u>

———————

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 04-cr-00051)
District Judge: Hon. Alan N. Bloch

———————

Argued October 25, 2006
Argued En Banc November 13, 2007

BEFORE: SCIRICA, *Chief Judge*, SLOVITER,
McKEE, RENDELL, BARRY, AMBRO,
FUENTES, SMITH, FISHER, CHAGARES, JORDAN,
HARDIMAN and COWEN, *Circuit Judges*

(Filed July 18, 2008)

Karen S. Gerlach, Esq. (Argued)
Office of the Federal Public Defender
1001 Liberty Avenue
1450 Liberty Center
Pittsburgh, PA 15222

Counsel for Appellant

Robert L. Eberhardt, Esq. (Argued)
Laura S. Irwin, Esq.
Office of the United States Attorney
700 Grant Street
Suite 400
Pittsburgh, PA 15219

Counsel for Appellee

---

## OPINION

---

SMITH, *Circuit Judge.*

The Supreme Court has not recognized a new category of speech that is unprotected by the First Amendment in over

2

twenty-five years.[1]  Nonetheless, in this case the Government invites this Court to take just such a step in order to uphold the constitutionality of 18 U.S.C. § 48 and to affirm Robert Stevens'

---

[1]The Supreme Court reaffirmed, in its recent decision in *United States v. Williams*, that "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection." *United States v. Williams*, __ U.S. __ (2008), 2008 WL 2078503 at *8 (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388 (1973); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949)).  The Court's application of that proposition to child pornography in *Williams* was undoubtedly new.  However, the Court's decision in *Williams* did not create a new category of unprotected speech.  To the contrary, the general principle that "offers to give or receive what it is unlawful to possess . . ." fall outside the realm of First Amendment protection is well established.  *Williams*, __ U.S. __ (2008), 2008 WL 2078503 at *8.  For example, the law has long recognized that the inclusion of a verbal or written component as part of the commission of an inchoate crime, like conspiracy or attempt, does not immunize a defendant from prosecution.  *Giboney*, 336 U.S. at 498 ("It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.  We reject the contention now.").  As such, we consider *Williams* distinct from the instant case, in which the Government seeks to exclude a new category of speech from First Amendment protections, rather than target the offer or solicitation of materials already proscribable.

3

conviction.[2]  For the reasons that follow, we decline the Government's invitation.  Moreover, because we agree with Stevens that 18 U.S.C. § 48 is an unconstitutional infringement on free speech rights guaranteed by the First Amendment, we will vacate his conviction.[3]

## I.

In March of 2004, a federal grand jury sitting in the Western District of Pennsylvania returned a three-count indictment against Stevens, a resident of Virginia.  All three counts charged Stevens with knowingly selling depictions of animal cruelty with the intention of placing those depictions in interstate commerce for commercial gain, in violation of 18 U.S.C. § 48.

---

[2]We exercise jurisdiction pursuant to 28 U.S.C. § 1291.  The District Court had jurisdiction under 18 U.S.C. § 3231.  We exercise plenary review over a challenge to the constitutionality of a federal statute. *Blackhawk v. Pennsylvania*, 381 F.3d 202, 206 (3d Cir. 2004).

[3] Stevens raises other challenges to his conviction based on the sufficiency of the evidence, the propriety of the jury instructions, and possible errors in the jury selection process. He also challenges the appropriateness of the District Court's sentencing him based on Guidelines intended for child pornography offenses.  It is unnecessary for us to reach these issues.

The indictment arose out of an investigation by federal and Pennsylvania law enforcement agents who had discovered that Stevens had been advertising pit bull related videos and merchandise through his business. Stevens advertised these videos in *Sporting Dog Journal*, an underground publication featuring articles on illegal dogfighting. Law enforcement officers arranged to buy three videotapes from Stevens, which form the basis for each of the counts in the indictment. The first two tapes, entitled "Pick-A-Winna" and "Japan Pit Fights," show circa 1960s and 70s footage of organized dog fights that occurred in the United States and involved pit bulls, as well as footage of more recent dog fights, also involving pit bulls, from Japan. The third video, entitled "Catch Dogs," shows footage of hunting excursions in which pit bulls were used to "catch" wild boar, as well as footage of pit bulls being trained to perform the function of catching and subduing hogs or boars. This video includes a gruesome depiction of a pit bull attacking the lower jaw of a domestic farm pig. The footage in all three videos is accompanied by introductions, narration and commentary by Stevens, as well as accompanying literature of which Stevens is the author.

As a result of their investigation, law enforcement officers obtained a search warrant for Stevens' Virginia residence. One day later, on April 23, 2003, officers executed the search warrant and found several copies of the three videos, as well as other dogfighting merchandise. On March 2, 2004, a grand jury in the Western District of Pennsylvania returned an

indictment charging Stevens with three counts of knowingly selling depictions of animal cruelty with the intention of placing those depictions in interstate commerce for commercial gain, in violation of 18 U.S.C. § 48. In November of 2004, the District Court denied Stevens' motion to dismiss the indictment based on his assertion that § 48 abridged his First Amendment right to freedom of speech. The case proceeded to trial, and on January 13, 2005, the jury returned a verdict of guilty on each of the three counts. The District Court sentenced Stevens to 37 months of imprisonment and three years of supervised release. This appeal followed.

## II.

Stevens' case is the first prosecution in the nation under § 48 to proceed to trial, and this appeal represents the first substantive constitutional evaluation of the statute by a federal appellate court. 18 U.S.C. § 48 states:

> (a) Creation, sale, or possession.--Whoever knowingly creates, sells, or possesses a depiction of animal cruelty with the intention of placing that depiction in interstate or foreign commerce for commercial gain, shall be fined under this title or imprisoned not more than 5 years, or both.

(b) Exception.--Subsection (a) does not apply to any depiction that has serious religious, political, scientific, educational, journalistic, historical, or artistic value.

(c) Definitions.--In this section–

>(1) the term "depiction of animal cruelty" means any visual or auditory depiction, including any photograph, motion-picture film, video recording, electronic image, or sound recording of conduct in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed, if such conduct is illegal under Federal law or the law of the State in which the creation, sale, or possession takes place, regardless of whether the maiming, mutilation, torture, wounding, or killing took place in the State; and

>(2) the term "State" means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands,

> Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and any other commonwealth, territory, or possession of the United States.

Resort here to some legislative history is instructive, not as a device to help us construe or interpret the statute, but rather to demonstrate the statute's breadth as written compared to what may originally have been intended. The legislative history for § 48 indicates that the primary conduct that Congress sought to address through its passage was the creation, sale, or possession of "crush videos." A crush video is a depiction of "women inflicting . . . torture [on animals] with their bare feet or while wearing high heeled shoes. In some video depictions, the woman's voice can be heard talking to the animals in a kind of dominatrix patter. The cries and squeals of the animals, obviously in great pain, can also be heard in the videos." H.R. REP. NO. 106-397, at 2 (1999). Testimony presented at a hearing on the Bill, and referenced in the House Committee Report, indicates that "these depictions often appeal to persons with a very specific sexual fetish who find them sexually arousing or otherwise exciting." *Id.* at 2–3.

One of the distinctive features of crush videos is that "the faces of the women inflicting the torture in the material often were not shown, nor could the location of the place where the cruelty was being inflicted or the date of the activity be

8

ascertained from the depiction." H.R. REP. NO. 106-397, at 3. Consequently:

> defendants arrested for violating a State cruelty to animals statute in connection with the production and sale of these materials . . . often were able to successfully assert as a defense that the State could not prove its jurisdiction over the place where the act occurred or that the actions depicted took place within the time specified in the State statute of limitations.

*Id.* The sponsor of the Bill in the House of Representatives, Rep. Elton Gallegly, emphasized that the purpose of the legislation was to target crush videos. These videos evidently turn a brisk business, particularly over the Internet. *See* 145 CONG. REC. E1067-01 (May 24, 1999) (extension of remarks by Rep. Elton Gallegly); 145 CONG. REC. H10267-01 (Oct. 19, 1999). The discussion of the Bill in the Senate similarly focused on § 48 as a tool to aid in the elimination of crush videos. *See* 145 CONG. REC. S15220-03 (Nov. 19, 1999).

Yet, the government interests identified in the House Committee Report in support of § 48 do not focus on crush videos. The primary interest identified there is the federal government's interest in "regulating the treatment of animals." H.R. REP. NO. 106-397, at 3. Similarly, the House Report states that the Government has an interest in discouraging individuals from becoming desensitized to animal violence generally,

because that may serve to deter future antisocial behavior toward human beings. *Id.* at 4.

This broader focus on animal cruelty is consistent with the text of § 48 and it is also reflected in the House Report's discussion of why the speech that § 48 targets should be deemed outside the protection of the First Amendment. *Id.* at 4–5. The Report concedes that § 48 is a content-based restriction, but states that the harm it would address, by reducing cruelty to animals, "so outweighs the expressive interest, if any, at stake, that the materials [prohibited by § 48] may be prohibited as a class." *Id.* at 5. The Report minimizes the expressive interest of any speech prohibited by the statute because "[b]y the very terms of the statute, material depicting cruelty to animals that has serious utility–whether it be religious, political, scientific, educational, journalistic, historic, or artistic–falls outside the reach of the statute." *Id.* at 4.

## III.

The Government does not allege that Stevens participated in the interstate transport of "crush videos." Nor does the Government allege that the videos Stevens sold contained prurient material. The Government also concedes that § 48 constitutes a content-based restriction on speech. Nonetheless, the Government argues that the type of speech regulated by § 48 falls outside First Amendment protection. By doing so, the Government asks us to create a new category of unprotected

10

speech.  We proceed in two parts.  First, we show how § 48 regulates protected speech.  Second, because § 48 regulates protected speech, we must subject the statute to strict scrutiny. As shown below, the statute cannot withstand that heightened level of scrutiny.

The *acts* of animal cruelty that form the predicate for § 48 are reprehensible, and indeed warrant strong legal sanctions. The Government is correct in arguing that animal cruelty should be the subject of not only condemnation but also prosecution. To this end, anti-animal cruelty statutes have been enacted in all fifty states and the District of Columbia.[4]  These statutes target

---

[4]The following state animal protection statutes are currently in place:  ALASKA STAT. § 11.61.140 (2004); ALA. CODE § 13A-11-14 (1977); ARIZ. REV. STAT. ANN. § 13-2910 (2002); ARK. CODE ANN. § 5-62-101 (2001); CAL. PENAL CODE § 597 (1998); COLO. REV. STAT. § 18-9-202 (2007); CONN. GEN. STAT. § 53-247 (2004); DEL. CODE ANN. tit. 11, § 1325 (2002); FLA. STAT. § 828.12 (2002); GA. CODE ANN. § 16-12-4 (2000); HAW. REV. STAT. § 711-1109 (2007); IDAHO CODE Ann. §§ 25-3501-3507 (2008); 510 ILL. COMP. STAT. §§ 70/3.01-3.03, 70/3.03-1 (2008); IND. CODE §§ 35-46-3-7, 35-46-3-8, 35-46-3-9, 35-46-3-9.5 (2007); IOWA CODE § 717B.3A (2003), *amended by* 2008 Ia. Legis. Serv. S.F. 2177 (West); KAN. STAT. Ann. § 21-4310 (2007); KY. REV. STAT. ANN. §§ 525.125, 525.130, 525.135 (2007), *amended by* 2008 Kentucky Laws Ch. 136 (SB 58); LA. REV. STAT. ANN. §§ 14:102.1, 14:102.4 (2008); ME. REV. STAT. ANN. tit. 17, §§ 1031, 1033 (2007), *amended by*

the actual conduct that offends the sensibilities of most citizens.

---

2008 Me. Legis. Serv. Ch. 702 (West); MD. CODE ANN., CRIM. LAW §§ 10-604, 10-606, 10-607, 10-608 (2008); MASS.GEN.LAWS ch. 272, § 77 (2006); MICH. COMP. LAWS §§ 750.50(2), (4), 750.50b(2) (2003); MINN. STAT. §§ 343.21(7), (9) (2004); MISS. CODE ANN. §§ 97-41-2, -3, -5, -7, -9, -11, 13, -15, -17, -19, -21, -23 (2008); MO. REV. STAT. §§ 578.012, .025, .050 (2008); MONT. CODE ANN. §§ 45-8-211, 217 (2007); NEB. REV. STAT. §§ 28-1005, -1009, -1010, -1017 (2007); NEV. REV. STAT. § 574.050-.200 (2008); N.H. REV. STAT. ANN. §§ 644:8 (III), (III-a) (2008); N.J. STAT. ANN. § 4:22-17(b) (2008); N.M. STAT. ANN. § 30-18-1 (2008); N.Y. AGRIC. & MKTS. LAW §§ 350-353-a (McKinney 2008); N.C. GEN. STAT. §§ 14-360 to -363.2 (2007); N.D. Cent. Code §§ 36-21.1-01 to -21.1-15 (2007); OHIO REV. CODE ANN. §§ 959.01-.20 (2008); OKLA. STAT. ANN. tit. 21, § 1685 (2008); OR. REV STAT. ANN. §§ 167.310, .315, .320, .322, .325, .330, .333, .340 (2007); 18 PA. CONS. STAT. ANN. § 5511(a)(2.1) (2007); R.I. GEN. LAWS §§ 4-1-1 to 4-1-38 (2007); S.C. CODE ANN. § 47-1-10 to -210 (2007); S.D. CODIFIED LAWS §§ 40-1-1–40-1-41 (2008); TENN. CODE ANN. §§ 39-14-201 to 39-14- 214 (2008); TEX. PENAL CODE ANN. §§ 42.09–.10 (2008); UTAH CODE ANN. §§ 76-9-301–307 (2008), *amended by* 2008 Utah Laws Ch. 292; VT. STAT. ANN. tit. 13, §§ 351–354 (2007); 2008 Va. Acts. 860 (to be codified at VA. CODE ANN. §§ 3.2-6566–6573); WASH REV. CODE §§ 16.52.011–.305 (2008); W. VA. CODE §§ 7-10-3 to -4a (2008); WIS. STAT. §§ 951.01–.18 (2007); WYO. STAT. ANN. § 6-3-203 (2007); D.C. CODE ANN. §§ 22-1001–.1015 (2008).

The fundamental difference between these state statutes and §
48 is that the latter does not federally criminalize the conduct
itself. Rather, § 48 prohibits the creation, sale, or possession of
a *depiction* of animal cruelty. That regulating a depiction has
First Amendment implications is obvious. We begin, then, with
the Government's contention that the depictions of animal
cruelty restricted by 18 U.S.C. § 48 qualify as categorically
unprotected speech.

### A. § 48 Regulates Protected Speech

It has been two and a half decades since the Supreme
Court last declared an entire category of speech unprotected.
*See New York v. Ferber*, 458 U.S. 747 (1982) (holding that child
pornography depicting actual children is not protected speech);
*see also Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 256
(2002) (refusing to recognize virtual child pornography as a
category of unprotected speech). Other types of speech that are
categorically unprotected include: fighting words, *Chaplinsky v.
New Hampshire*, 315 U.S. 568 (1942), threats, *Watts v. United
States*, 394 U.S. 705 (1969), speech that imminently incites
illegal activity, *Brandenburg v. Ohio*, 395 U.S. 444 (1969), and
obscenity, *Miller v. California*, 413 U.S. 15 (1973). The
common theme among these cases is that the speech at issue
constitutes a grave threat to human beings or, in the case of
obscenity, appeals to the prurient interest.

The Government acknowledges that the speech at issue

13

in this case does not fall under one of the traditionally unprotected classes. The Government argues, however, that these categories may be supplemented. That, in itself, is an unassailable proposition. But, we disagree with the suggestion that the speech at issue here can appropriately be added to the extremely narrow class of speech that is unprotected. Out of these categories, only *Ferber* is even remotely similar to the type of speech regulated by § 48.[5] Recognizing this difficulty, the Government attempts to analogize between the depiction of animal cruelty and the depiction of child pornography.[6] That

_____

[5]We do not address the constitutionality of a hypothetical statute that would only regulate crush videos. While such a hypothetical statute might target obscenity under the *Miller* test because crush videos appeal to a prurient interest, the actual text of § 48 and the facts of this case show just how far afield the statute's language drifted from the original emphasis in the Congressional Record on the elimination of crush videos.

[6]The Government suggests that its position is supported by the Supreme Court's decision in *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942). The Government reads *Chaplinsky* to establish a simple balancing test to determine whether to recognize a class of speech as unworthy of First Amendment protection. The test weighs the government interest in restricting the speech against the value of the speech. *See id.* at 572. As we show, the only possible way to conclude that § 48 regulates unprotected speech is through an analogy to the *Ferber* rationale. In our discussion of *Ferber*, we will address both parts of the *Chaplinsky* inquiry. We note, however, that the limited number of unprotected speech categories recognized

attempt simply cannot carry the day.

In *Ferber*, the Court considered the constitutionality of a New York criminal statute that prohibited persons from knowingly promoting sexual performances by children under the age of 16 by distributing material that depicted such performances. *Ferber*, 458 U.S. at 747. The case arose when Paul Ferber, the owner of a Manhattan bookstore specializing in sexually oriented products, sold to undercover officers two films that were "devoted almost exclusively to depicting young boys masturbating." *Id.* at 751–52. A jury convicted Ferber of disseminating child pornography, in violation of a statute that did not require proof that such materials were obscene. *Id.* at 752. The New York Court of Appeals reversed, holding that the statute at issue violated the First Amendment because it "could not be construed to include an obscenity standard, and therefore would prohibit the promotion of materials traditionally entitled to protection under the First Amendment." *Id.* at 747.

The Supreme Court in turn reversed the New York Court of Appeals, holding that the statute was constitutional because

since *Chaplinsky* strongly suggests that the balancing test tilts in favor of protection. *See* James L. Swanson, *Unholy Fire: Cross Burning, Symbolic Speech, and the First Amendment:* Virginia v. Black, 2003 CATO SUP. CT. REV. 81, 90 (2002-2003) (noting that "later precedents diluted the authority of *Chaplinsky* and, while the Court has never overruled it, *Chaplinsky* has certainly been marginalized").

child pornography, whether obscene or not, is unprotected by the First Amendment. *Id.* at 756. In reaching that conclusion, the Court cited five factors favoring the creation of a new category of unprotected speech:

> 1. The State has a "compelling" interest in "safeguarding the physical and psychological well-being of a minor." *Id.* at 756-57 (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607 (1982)).
>
> 2. Child pornography is "intrinsically related to the sexual abuse of children in at least two ways. First, the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. Second, the distribution network for child pornography must be closed" in order to control the production of child pornography. *Id.* at 759 (citations omitted). The Court explained that the production of child pornography is a "low-profile, clandestine industry" and that the "most expeditious if not the only practical method of law

16

enforcement may be to dry up the market for this material" by punishing its use. *Id.* at 760.

3. "The advertising and selling of child pornography provide an economic motive for and are thus an integral part of the production" of child pornography. *Id.* at 761.

4. The possibility that there would be any material of value that would be prohibited under the category of child pornography is "exceedingly modest, if not *de minimis.*" *Id.* at 762.

5. Banning full categories of speech is an accepted approach in First Amendment law and is therefore appropriate in this instance. *Id.* at 763-64.

Amy Adler, *Inverting the First Amendment*, 149 U. PA. L. REV. 921, 938 n.77 (2001); *see also Ashcroft v. Free Speech Coalition*, 535 U.S. at 249–50 (focusing on factor number two in striking down part of an anti-child pornography federal statute that criminalized pornographic images made with virtual (computer-generated) children or adults dressed to look like children).

Without guidance from the Supreme Court, a lower federal court should hesitate before extending the logic of *Ferber* to other types of speech. The reasoning that supports *Ferber* has never been used to create whole categories of unprotected speech outside of the child pornography context. Furthermore, *Ferber* appears to be on the margin of the Supreme Court's unprotected speech jurisprudence. Adler, *supra*, at 936 (noting that, aside from child pornography, "when the Court eliminates a category of expression from constitutional protection, it carefully defines the speech that can be banned; the definition then serves as a limit on legislative enactments"). Part of what locates child pornography on the margin as an unprotected speech category is the conflation of the underlying act with its depiction. By criminalizing the depiction itself, "[c]hild pornography law has collapsed the 'speech/action' distinction that occupies a central role in First Amendment law[,]" and "is the only place in First Amendment law where the Supreme Court has accepted the idea that we can constitutionally criminalize the depiction of a crime." *Id*. at 970, 984; *see Osborne v. Ohio*, 495 U.S. 103, 144 n.18 (1990) (Brennan, J., dissenting). Child pornography contrasts with other categories of unprotected speech that share a much closer nexus between speech and an unlawful action that proximately results from the unprotected speech. *See, e.g.*, *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (addressing speech that imminently incites illegal activity). For these reasons, we are unwilling to extend the rationale of *Ferber* beyond the regulation of child pornography without express direction from the Supreme Court.

18

Even assuming that *Ferber* may, in limited circumstances and without Supreme Court guidance, be applied to other categories of speech, 18 U.S.C. § 48 does not qualify for such treatment. The Court cited five bases in *Ferber* for upholding the anti-child pornography law. That reasoning does not translate well to the animal cruelty realm. We address the five-factor rationale in its entirety, although the first factor is the most important because, under *Ferber*, if the Government's interest is not compelling, then this type of statute necessarily violates the First Amendment.

### 1. First *Ferber* Factor

The compelling government interest inquiry at issue here overlaps with the strict scrutiny analysis discussed presently. No matter how appealing the cause of animal protection is to our sensibilities, we hesitate–in the First Amendment context–to elevate it to the status of a *compelling* interest.

Three reasons give us pause to conclude that "preventing cruelty to animals" rises to a compelling government interest that trumps an individual's free speech rights. First, the Supreme Court has suggested that the kind of government interest at issue in § 48 is not compelling. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). The Supreme Court in *Lukumi* held that city ordinances that outlawed animal sacrifices could not be upheld based on the city's assertion that protecting animals was a compelling

19

government interest. *Id*. at 546–47. The Government contends that *Lukumi* is inapplicable to a compelling government interest analysis.

Although that case dealt with the Free Exercise Clause rather than the Free Speech Clause, and was limited by the Court to the context of the particular ordinances at issue, it remains instructive. The possible relevance of *Lukumi* was noted under the "Dissenting Views" section of the House Report of § 48:

> Although the Supreme court [sic] recognized the governmental interest in protecting animals from cruelty, as against the constitutional right of free exercise of religion[,] the governmental interest did not prevail. Therefore, it seems that, on balance, animal rights do not supersede fundamental human rights. Here, while Government can and does protect animals from acts of cruelty, to make possession of films of such acts illegal would infringe upon the free speech rights of those possessing the films.

H.R. REP. NO. 106-397, at 11. When we consider *Lukumi* along with the fact that the Supreme Court has not expanded the extremely limited number of unprotected speech categories in a generation, the only conclusion we are left with is that we—as a lower federal court—should not create a new category when

20

the Supreme Court has hinted at its hesitancy to do so on this same topic.

Second, while the Supreme Court has not always been crystal clear as to what constitutes a compelling interest in free speech cases, it rarely finds such an interest for content-based restrictions. When it has done so, the interest has–without exception–related to the well-being of human beings, not animals. When looking at these cases, as well as the interests at issue in the unprotected speech categories, it is difficult to see how § 48 serves a compelling interest that represents "a government objective of surpassing importance." *Ferber*, 458 U.S. at 757.

The Supreme Court has suggested that a state interest in avoiding an Establishment clause violation may be compelling, although that remains an unsettled question of law. *Compare Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761–62 (1995) ("compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech.") *with Good News Club v. Milford Central School*, 533 U.S. 98, 112–13 (2001) ("We have said that a state interest in avoiding an Establishment Clause violation 'may be characterized as compelling,' and therefore may justify content-based discrimination. However, it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination.") (citations omitted). The Government also "has a compelling interest in ensuring that

21

victims of crime are compensated by those who harm them" and "ensuring that criminals do not profit from their crimes." *Simon & Schuster*, *Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118–19 (1991). *But see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348–49 (1995); *Boos v. Barry*, 485 U.S. 312, 322–25 (1988); *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230–32 (1987). Similarly important human interests are at issue in constitutionally valid statutes regulating fighting words, threats, speech that imminently incites illegal activity, and obscenity. In *Ferber*, the Court illustrated the type of interest that must be at stake in order for it to be compelling. The Court stated, "[i]t is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling" because "[a] democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens." *Ferber*, 458 U.S. at 756–57 (quotations and citations omitted); *see also Ashcroft v. Free Speech Coalition*, 535 U.S. at 244 ("The sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people."); Eugene Volokh, *Freedom of Speech, Permissible Tailoring and Transcending Strict Scrutiny*, 144 U. PA. L. REV. 2417, 2420–21 (1996) (discussing other legitimate compelling government interests). Nothing in these cases suggests that a statute that restricts an individual's free speech rights in favor of protecting an animal is compelling.

Similarly, and even more fatal to the Government's

22

position, because the statute does not regulate the underlying act of animal cruelty–which must be a crime under state or federal law in order to trigger § 48–we can see no persuasive argument that such a statute serves a compelling government interest. While the statute at issue in *Ferber* also prohibited the distribution of the depiction of sexual performances by children under the age of 16, 458 U.S. at 749, the Supreme Court went to great lengths to cabin its discussion of the depiction/act conflation because of the special role that children play in our society.[7] Preventing cruelty to animals, although an exceedingly worthy goal, simply does not implicate interests of the same magnitude as protecting children from physical and psychological harm.

---

[7]*See Ferber*, 458 U.S. at 756–57; *id*. at 758 (stating that "the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child"); *id*. at 776 (Brennan, J., concurring in the judgment) ("This special and compelling interest [in protecting the well being of children], and the particular vulnerability of children, afford the State the leeway to regulate pornographic material, the promotion of which is harmful to children, even though the State does not have such leeway when it seeks only to protect consenting adults from exposure to such material."); *id*. at 777–78 (Stevens, J., concurring in the judgment) ("The character of the State's interest in protecting children from sexual abuse justifies the imposition of criminal sanctions against those who profit, directly or indirectly, from the promotion of such films.").

23

Third, there is not a sufficient link between § 48 and the interest in "preventing cruelty to animals." As the Government recognizes, Congress and the states already have in place comprehensive statutory schemes to protect animals from mistreatment. The Government states that "all fifty states have enacted laws which criminalize the infliction of cruelty on animals. This includes laws which outlaw dog fighting in all 50 states." Gov't Br. 32. These statutes are materially different from § 48. Section 48 does nothing to regulate the underlying conduct that is already illegal under state laws. Rather, it regulates only the depiction of the conduct.

In order to serve the purported compelling government interest of preventing animal cruelty, the regulation of these depictions must somehow aid in the prevention of cruelty to animals. With this depiction/act distinction in mind, it seems appropriate to recast the compelling government interest as "preventing cruelty to animals that state and federal statutes *directly* regulating animal cruelty under-enforce." *See Ashcroft v. ACLU*, 542 U.S. 656, 683 (2004) (Breyer, J., dissenting) (noting that "the question here is whether the Act, given its restrictions. . ., significantly advances that [compelling] interest"). The House Committee Report for § 48 stated that the statute targeted the depiction rather than the act because under-enforcement of state animal cruelty laws is a particular problem in the crush video industry. H.R. REP. NO. 106-397, at 3. The

24

Report approvingly cited witnesses who testified to this effect.[8]

[8]As the House Committee Report stated:

> The witnesses testified that the faces of the women inflicting the torture in the material often were not shown, nor could the location of the place where the cruelty was being inflicted or the date of the activity be ascertained from the depiction. As a result, defendants arrested for violating a State cruelty to animals statute in connection with the production and sale of these materials in that State often were able to successfully assert as a defense that the State could not prove its jurisdiction over the place where the act occurred or that the actions depicted took place within the time specified in the State statute of limitations. While all States have some form of a cruelty to animal statute, none have a statute that prohibits the sale of depictions of such cruelty. Accordingly, according to the witnesses, only if the person making these depictions were caught in the act (often through some type of undercover operation) could the State's laws be brought to bear on their actions, and then only for the cruelty itself, not for the production and sale of the depictions.

H.R. REP. NO. 106-397, at 3. Perhaps wary of the federalism implications of § 48, the House Committee Report made sure to state that "[t]he statute is intended to augment, not supplant,

25

Consistent with these findings, the Government states that "as a practical matter, it is nearly impossible to identify the persons involved in the acts of cruelty or the place where the acts occurred." Gov't Br. 32. While this justification is plausible for crush videos, it is meaningless when evaluating § 48 as written. By its terms, the statute applies without regard to whether the identities of individuals in a depiction, or the location of a depiction's production, are obscured.

The Government also argues that § 48 indirectly serves to deter future animal cruelty and other antisocial behavior by discouraging individuals from becoming desensitized to animal violence. As support for its position, the Government approvingly cited the House Committee Report, which cited research that "suggest[ed] that violent acts committed by humans may be the result of a long pattern of perpetrating abuse, which 'often begins with the torture and killing of animals.'" Gov't Br. 31–32 (citing H.R. REP. NO. 106-397, at 4 [sic]). The full quote is as follows:

> The committee also notes the increasing body of research which suggests that humans who kill or abuse others often do so as the culmination of a long pattern of abuse, which often begins with the

State animal cruelty laws by addressing behavior that may be outside the jurisdiction of the States, as a matter of law, and appears often beyond the reach of their law enforcement officials, as a practical matter." *Id.*

26

torture and killing of animals. When society fails to prevent these persons from inflicting harm upon animals as children, they may fail to learn respect for any living being. If society fails to prevent adults from engaging in this behavior, they may become so desensitized to the suffering of these beings that they lose the ability to empathize with the suffering of humans.

H.R. REP. NO. 106-397, at 4. We read this passage to mean that, by broadly prohibiting these depictions of animal cruelty, the drafters of the House Committee Report believed that fewer individuals will see and make such depictions and therefore not be subject to this desensitization.

This reasoning is insufficient to override First Amendment protections for content-based speech restrictions. The Supreme Court has rejected a similar argument in the context of virtual child pornography, stating that "[w]hile the Government asserts that the images can lead to actual instances of child abuse, the causal link is contingent and indirect. The harm does not necessarily follow from the speech, but depends upon some unquantified potential for subsequent criminal acts." *Ashcroft v. Free Speech Coalition*, 535 U.S. at 250 (internal citation omitted). When balanced against First Amendment rights, the "mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Id*. at 253. The Supreme Court cannot speak more clearly than it has on this issue: "The prospect of crime . . . by itself does not justify laws

27

suppressing protected speech." *Id.* at 245. Similarly, general references to speech repugnant to public mores cannot serve as a compelling government interest sufficient to override constitutional protections of speech. *See, e.g.*, *United States v. Eichman*, 496 U.S. 310, 319 (1990) ("If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.") (citing *Texas v. Johnson*, 491 U.S. 397, 414 (1989)); *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 826 (2000)).

For these reasons, we fail to see how 18 U.S.C. § 48 serves a compelling government interest.

## 2. Second *Ferber* Factor

The second factor in the *Ferber* rationale, that child pornography is "intrinsically related to the sexual abuse of children," *Ferber*, 458 U.S. at 759, is a similarly weak position for the Government to rely upon in this case. In *Ferber*, the Court reasoned that child pornography should be banned, in part, because the pornographic material continues to harm the children involved even after the abuse has taken place. While animals are sentient creatures worthy of human kindness and human care, one cannot seriously contend that the animals themselves suffer continuing harm by having their images out in the marketplace. Where children can be harmed simply by

28

knowing that their images are available or by seeing the images themselves, animals are not capable of such awareness. Put differently, when an animal suffers an act of cruelty that is captured on film (or by some other medium of depiction or communication), the fact that the act of cruelty was captured on film in no way exacerbates or prolongs the harm suffered by that animal.

### 3. Third *Ferber* Factor

Both the second and third *Ferber* factors assert that the distribution network for child pornography must be closed so that the production of child pornography will decrease.[9] This drying-up-the-market theory, based on decreasing production, is potentially apt in the animal cruelty context. However, there is no empirical evidence in the record to confirm that the theory is valid in this circumstance. *See Bartnicki v. Vopper*, 532 U.S. 514, 531 n.17 (2001); *see also Ashcroft v. Free Speech Coalition*, 535 U.S. at 250–51 (apparently questioning the independent value of *Ferber*'s drying-up-the-market rationale); Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharged Zones*, 90 CORNELL L. REV.

---

[9]The third *Ferber* factor specifically states that "[t]he advertising and selling of child pornography provide an economic motive for and are thus an integral part of the production" of child pornography. *Ferber*, 458 U.S. at 761.

1277, 1324–25 (2005).  Indeed, the fact that most dog fights are conducted at live venues and produce significant gambling revenue suggests that the production of tapes such as those at issue in this case does not serve as the primary economic motive for the underlying animal cruelty the Government purports to target.[10]  Moreover, standing alone this factor sweeps so broadly it should not be deployed to justify extracting an entire category of speech from First Amendment protections.  Restriction of the depiction of almost any activity can work to dry up, or at least restrain, the activity's market.

### 4.  Fourth *Ferber* Factor

The fourth *Ferber* factor is that the value of the prohibited speech is "exceedingly modest, if not *de minimis*."[11] 458 U.S. at 762; *see also Chaplinsky*, 315 U.S. at 572.  The Government finds support for the low value of the speech restricted by the Act by pointing to the exceptions clause of 18

---

[10]To that end, a Dogfighting Fact Sheet prepared by the Humane Society of the United States, which filed an Amicus Brief in this case, states that "[s]pectators provide much of the profit associated with dogfighting. The money generated by admission fees and gambling helps keep this 'sport' alive." The Humane Society of the United States Dogfighting Fact Sheet, http://www.hsus.org/hsus_field/animal_fighting_the_final_round/dogfighting_fact_sheet/ (last visited May 9, 2008).

[11]As to the fifth *Ferber* factor, it is discussed throughout this opinion.

U.S.C. § 48(b). Section (b) states that the Act "does not apply to any depiction that has serious religious, political, scientific, educational, journalistic, historical, or artistic value." The House Committee Report viewed these categories as broad.[12] Still, just how broad these categories actually are is subject to debate because most of the legislative history focuses on the depiction of animal cruelty for prurient purposes in so-called crush videos.[13]

---

[12]*See* H.R. REP. NO. 106-397, at 4 ("While the exclusion described in the statute is expressed in seven different categories, the committee believes that any material depicting animal cruelty which society would find to be of at least some minimal value, falls within one of these broad, general categories.").

[13]One further point of clarification should be mentioned in reference to the section (b) defense. The parties in this case agree that the Government must prove, beyond a reasonable doubt, that the speech contains no serious value. In contrast, the legislative history of the statute specifically states that "[t]he defendant bears the burden of proving the value of the material by a preponderance of the evidence." *See* H.R. REP. No. 106-397, at 8. Because Stevens brings a facial challenge to the statute and there is a chance that prosecutors in the future will frame the exceptions clause as an affirmative defense, we take this opportunity to sound an alarm. In the free speech context, using an affirmative defense to save an otherwise unconstitutional statute presents troubling issues. "The Government raises serious constitutional difficulties by seeking to impose on the defendant the burden of proving his speech is

31

The exceptions clause cannot on its own constitutionalize § 48. The exceptions clause in this case is a variation of the third prong of the *Miller* obscenity test. This prong asks "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 24 (1973); *see also Ashcroft v. Free Speech Coalition*, 535 U.S. at 246–47. As one scholar has stated, "[i]t has long been a principle of adult obscenity law that no matter how shocking or how offensive a sexually explicit work might otherwise be, it should be protected speech if it demonstrates serious artistic value." Adler, *supra*, at 967. The role of the clause in *Miller* cannot be divorced from the first two parts of the obscenity test, which emphasize patent offensiveness and an appeal to the prurient interest.

This type of exceptions clause has not been applied in non-prurient unprotected speech cases, and taking it out of this context ignores the essential framework of the *Miller* test. Congress and the Government would have the statute operate in such a way as to permit the restriction of otherwise

not unlawful. An affirmative defense applies only after prosecution has begun, and the speaker must himself prove, on pain of a felony conviction, that his conduct falls within the affirmative defense." *Ashcroft v. Free Speech Coalition*, 535 U.S. at 255. Viewing the exceptions clause as an affirmative defense poses an even greater threat to chill constitutional speech than the interpretation of § 48 offered by the Government in this case.

constitutional speech so long as part of the statute allows for an exception for speech that has "serious value." The problem with this view is twofold. First, outside of patently offensive speech that appeals to the prurient interest, the First Amendment does not require speech to have serious value in order for it to fall under the First Amendment umbrella. What this view overlooks is the great spectrum between speech utterly without social value and high value speech. Second, if the mere appendage of an exceptions clause serves to constitutionalize § 48, it is difficult to imagine what category of speech the Government could not regulate through similar statutory engineering. That is not a road down which this Court is willing to proceed.

In sum, the speech restricted by 18 U.S.C. § 48 is protected by the First Amendment. The attempted analogy to *Ferber* fails because of the inherent differences between children and animals. Those profound differences require no further explication here.

B. §48 Cannot Survive Heightened Scrutiny

Because the speech encompassed by § 48 does not qualify as unprotected speech, it must survive a heightened form of scrutiny.[14] A content-based restriction on speech is

---

[14]For an illuminating discussion of the Supreme Court's application of strict scrutiny in examining content-based restrictions on speech, see Barry P. McDonald, *Speech and*

33

"presumed invalid," and the Government bears the burden of showing its constitutionality. *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004) (citations omitted). One scholar notes that "a majority of the Court has never sustained a regulation that was strictly scrutinized for content discrimination reasons." Barry P. McDonald, *Speech and Distrust: Rethinking the Content Approach to Protecting the Freedom of Expression*, 81 NOTRE DAME L. REV. 1347, 1365 n.63 (2006); *see also Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."); Adam Winkler, *Fatal in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts*, 59 VAND. L. REV. 793, 844–57 (2006) (discussing the results of applying strict scrutiny in a variety of free speech contexts at all federal court levels). Section 48 fails strict scrutiny because it serves no compelling government interest, is not narrowly tailored to achieve such an interest, and does not provide the least restrictive means to achieve that interest. *See Sable Commc'ns*

*Distrust: Rethinking the Content Approach to Protecting the Freedom of Expression*, 81 NOTRE DAME L. REV. 1347, 1363-67 (2006); *see also Playboy Entm't Group*, 529 U.S. at 818 ("It is rare that a regulation restricting speech because of its content will ever be permissible. Indeed, were we to give the Government the benefit of the doubt when it attempted to restrict speech, we would risk leaving regulations in place that sought to shape our unique personalities or to silence dissenting ideas.").

*of Calif., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989).

We have already shown why § 48 does not serve a compelling government interest, thus failing strict scrutiny. Because of the peculiarities of this statute, though, we briefly discuss the relationship between § 48 and the strict scrutiny analysis. The Supreme Court's free speech jurisprudence regarding content-based restrictions on speech in the first instance appears simple to apply. First, is the speech protected or unprotected? If the speech is unprotected, then Congress can regulate fairly easily. If the speech is protected, does the statute survive strict scrutiny? In practice, as pointed out previously, this heightened level of scrutiny nearly always results in the statute being invalidated. At the risk of complicating this parsimonious two-tiered structure, we note that federalism concerns illustrate the difficulties with the strict scrutiny analysis.

The problem lies in defining the compelling government interest when Congress does not have the constitutional power to regulate an area that has traditionally been governed by state statutes. When federalism concerns arise, the "least restrictive means" analysis necessarily informs the "compelling government interest" analysis. The stated governmental interest in 18 U.S.C. § 48 is to "prevent cruelty to animals." Taking federalism concerns into account, the interest stated in this manner is too broad. Absent demonstration of the requisite impact on commerce which is absent on this record, Congress

35

does not have the constitutional authority to pass the types of animal cruelty statutes that are seen in the fifty states and the District of Columbia. It is for this reason that we have suggested that the compelling government interest should be redefined as "preventing cruelty to animals that state and federal statutes *directly* regulating animal cruelty under-enforce." And once this reformulation of the interest targeted by § 48 is accepted, we do not see how a sound argument can be made that the Free Speech Clause is outweighed by a statute whose primary purpose is to aid in the enforcement of an already comprehensive state and federal anti-animal-cruelty regime. Conversely, if we agree with the Government that the compelling government interest is "preventing cruelty to animals," then we do not see how a sound argument can be made that § 48 is narrowly tailored and uses the least restrictive means.

The Supreme Court routinely strikes down content-based restrictions on speech on the narrow tailoring/least restrictive means prong of strict scrutiny. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656 (2004); *Playboy Entm't Group*, 529 U.S. at 816; *Sable Commc'ns of Calif., Inc.,* 492 U.S. at 126–31; *R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 395–96 (1992); Volokh, *Freedom of Speech*, *supra*, at 2421–23. Accepting for a moment that the Government's interest is "preventing cruelty to animals," then § 48 is not narrowly tailored.

First, with respect to the reach of the Commerce Clause,

36

§ 48 does not prohibit *any* depictions—including crush videos—that are made solely for personal rather than interstate commercial use. Party X may create a depiction of animal cruelty in Virginia and sell it in Virginia without violating § 48, so long as Party X does not intend to place that depiction in interstate or foreign commerce. Accordingly, if we accept that the government interest served by § 48 is to prevent animal cruelty, the statute is–by its very terms–underinclusive.

Second, § 48 is overinclusive. Although the statute would fail to reach depictions made solely for personal use, Party Y may, however, be prosecuted for selling a depiction in Pennsylvania made in Virginia even if the underlying activity is legal in Virginia but illegal in Pennsylvania. Party Z may be prosecuted for possessing a depiction in Virginia made in the Northern Mariana Islands even if the underlying activity is legal in the Northern Mariana Islands so long as Party Z intends to sell the depiction. *See* H.R. REP. NO. 106-397, at 11–12 (dissenting view). If the government interest is to prevent acts of animal cruelty, the statute's criminalization of depictions that were legal in the geographic region where they were produced makes § 48 overinclusive. *See Simon & Schuster*, 502 U.S. at 121–22.

Third, the second *Ferber* factor implicitly addressed the fit between regulating the depiction of a behavior with preventing that behavior. Specifically, the Supreme Court stated that "the distribution network for child pornography must be

37

closed if the production of material which requires the sexual exploitation of children is to be effectively controlled." *Ferber*, 458 U.S. at 759. To the extent that this aspect of the intrinsic relationship between banned speech and the harm to be prevented applies to § 48, it applies to a lesser degree, and the arguments by the Government in support of this analogy fall flat.[15] The Government first asserts that, as is true in the case of child pornography, the actors and producers of crush videos and other speech banned by § 48– i.e., the perpetrators of the underlying acts of animal cruelty–are very difficult to find and prosecute for those underlying acts. This is true as to crush videos because the only person typically onscreen is the "actress," and only her legs or feet are typically shown. However, as demonstrated by Stevens' prosecution, crush videos constitute only a portion of the speech banned by the terms of § 48. Prosecution of this sliver of the speech covered by § 48 could not, by itself, justify banning all of the speech covered by the statute.

---

[15]The Government states that "[b]y providing a tool to prosecute those who openly sell films and photographs showing animal cruelty, Section 48 plugs the inadequacies inherent in attempting to address this animal cruelty problem through state laws which prohibit only the actual conduct." Gov't. Br. 32-33. However, as shown by the videos in this case, § 48 regulates depictions produced legally in foreign countries as well as depictions in the United States produced prior to the Act's passage in 1999.

38

As to dog fighting, the Government argues that the camera typically focuses on the dogs, with their "handlers" being shown mostly from the waist or elbows down, and it is often difficult to determine when and where such fights occur for purposes of the statute of limitations and other enforcement matters. At least with respect to the videos at issue in this case, we find the Government's argument empirically inaccurate. It is true that in the first video, "Pick-A-Winna," much of the footage is old, but the faces of the individuals involved are sometimes quite clear. In the second video, "Japan Pit Fights," the fights take place in Japan, where dog fighting is apparently legal and prosecution of those individuals for those particular acts of animal cruelty could not be pursued. The third video, "Catch Dogs," primarily features footage of dogs hunting and subduing wild hogs and being trained to do so. This video gives the name and address of a catch dog supplier, and also takes the viewer on several hunting trips with these dogs. There is no effort to conceal any of the faces of the people in the video, and Stevens at several points mentions their names and the location of the hunts. In short, the research and empirical evidence in the record before us simply does not support the notion that banning depictions of animal cruelty is a necessary or even particularly effective means of prosecuting the underlying acts of animal cruelty. Much less is it the "most expeditious" or the "only practical method" of prosecuting such acts, as is the case within the realm of child pornography and child sexual abuse. *Ferber*, 458 U.S. at 760.

For these reasons, § 48 is not narrowly tailored using the least restrictive means.

## IV.

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Playboy Entm't Group*, 529 U.S. at 816. The Government has not met this burden. Therefore, we will strike down 18 U.S.C. § 48 as constitutionally infirm because it constitutes an impermissible infringement on free speech. In light of this conclusion, we will vacate Robert Stevens' conviction.[16]

---

[16]18 U.S.C. § 48 might also be unconstitutionally overbroad. The Government is too quick to conclude that a reading of the statute that covers a wide variety of ostensibly technical violations like hunting and fishing will not lead to prosecutions. This Court is required to examine the plain language of the statute to determine whether "a substantial amount of protected speech is prohibited or chilled in the process" of regulating depictions of animal cruelty. *Ashcroft v. Free Speech Coalition*, 535 U.S. at 255. Even if we incorrectly assume that § 48 constitutionally reaches the type of depictions sold by Stevens, we must pose reasonable but challenging hypotheticals to determine the statute's sweep. *See, e.g.*, *id*. at 247–48 (positing, in an overbreadth analysis, that Shakespeare's *Romeo and Juliet* and Steven Soderberg's Academy Award-nominated *Traffic* potentially fell under the ambit of the Child Pornography Prevention Act of 1996). We must not forget that "[t]he

40

Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Id*. at 244.

The statute potentially covers a great deal of constitutionally protected speech, and prosecutions that stray far from crush videos may chill this type of speech. Section 48 broadly proclaims that "the term 'depiction of animal cruelty' means any visual or auditory depiction, including any photograph, motion-picture film, video recording, electronic image, or sound recording of conduct in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed, if such conduct is illegal under Federal law or the law of the State in which the creation, sale, or possession takes place, regardless of whether the maiming, mutilation, torture, wounding, or killing took place in the State." 18 U.S.C. § 48(c)(1). If a person hunts or fishes out of season, films the activity, and sells it to an out-of-state party, it appears that the statute has been violated. Similarly, the same person could be prosecuted for selling a film which contains a depiction of a bullfight in Spain if bullfighting is illegal in the state in which this person sells the film. The only possible protections for this violator are prosecutorial discretion and the exceptions clause in section (b). If this depiction has "religious, political, scientific, educational, journalistic, historical, or artistic value" but the value is not "serious," then this violator only has prosecutorial discretion to fall back on. The penalty for these hypothetical violations includes a fine and up to five years in prison. 18 U.S.C. § 48(a). We do not believe that the constitutionality of § 48 should depend on prosecutorial discretion for a statute that sweeps this widely. *See* Alan K. Chen, *Statutory Speech*

41

COWEN, <u>Circuit Judge</u>, <u>dissenting</u> with whom FUENTES and FISHER, <u>Circuit Judges</u> join

*Bubbles, First Amendment Overbreadth, and Improper Legislative Purpose*, 38 HARV. C.R.-C.L. L. REV. 31, 42 (2003) ("If the Constitution permits broadly worded statutes that sweep a great deal of protected speech within their provisions, officials have unbridled discretion to arrest and prosecute speakers based on the government's disagreement with their messages or content."). There is no reason to believe that prosecutors will limit themselves to targeting crush videos through § 48. The American Prosecutors Research Institute, a non-profit research arm of the National District Attorneys Association, for example, has noted in a report that "[d]espite the originally narrow focus, the law [§ 48] was used in 2005 to successfully prosecute a Virginia man charged with selling and mailing videotapes of fighting pit bulls." ANIMAL CRUELTY PROSECUTION: OPPORTUNITIES FOR EARLY RESPONSE TO CRIME AND INTERPERSONAL VIOLENCE 33 (July 2006). This report is essentially a how-to guide for prosecutors, and publicizing Stevens' indictment has the potential to spur future similar prosecutions.

However, because voiding a statute on overbreadth grounds is "strong medicine" and should be used "sparingly and only as a last resort," we are satisfied to rest our analysis on strict scrutiny grounds alone. *See Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

42

The majority today declares that the Government can have no compelling interest in protecting animals from intentional and wanton acts of physical harm, and in doing so invalidates as unconstitutional a federal statute targeting the distribution and trafficking of depictions of these senseless acts of animal cruelty. Because we cannot agree, in light of the overwhelming body of law across the nation aimed at eradicating animal abuse, that the Government's interest in ensuring the humane treatment of animals is anything less than of paramount importance, and because we conclude the speech prohibited by 18 U.S.C. § 48 to be of such minimal socially redeeming value that its restriction may be affected consistent with the First Amendment, we respectfully dissent.

I.

In the seminal case *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942), the Supreme Court articulated the fundamental limits of the First Amendment's protections:There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words – those which by their very utterance inflict injury or tend

43

to incite an immediate breach of the peace. *It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.*

*Id.* at 571-72 (footnotes omitted) (emphasis added). It is undisputed that the speech at issue in this case does not fit within one of the traditionally unprotected[17] classes. However, as even the majority agrees, that these categories may be supplemented is beyond dispute. Most recently, the Supreme Court in *New York v. Ferber*, 458 U.S. 747 (1982) did just this, when it recognized child pornography as an additional category of unprotected speech.

The Supreme Court has provided us with two beacons to guide our inquiry into whether depictions of animal cruelty

---

[17] Throughout this opinion we refer to speech as "unprotected" as a form of shorthand. We mean that "these areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content*." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992) (emphasis in original). Because 18 U.S.C. § 48 does not engage in any content discrimination within the category of animal cruelty depictions, *cf. id.* at 386, using such shorthand does not raise constitutional concerns.

should be recognized as beyond the reach of the First Amendment. First, the Supreme Court has consistently reaffirmed that the Government may, consistent with the Constitution, restrict certain types of speech when the social value of the speech is so minimal as to be plainly outweighed by the Government's compelling interest in its regulation. *See, e.g.*, *Virginia v. Black*, 538 U.S. 343, 358-59 (2003) (citing *Chaplinsky*, 315 U.S. at 571-72); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382-83 (1992) (quoting *Chaplinsky*, 315 U.S. at 572).[18] Second, in *Ferber*, the Court articulated four critical considerations demonstrating the inextricable connection

[18] To the extent the majority suggests that *Chaplinsky* is somehow of diminished precedential force, we respectfully disagree. While it is true that the broad "fighting words" doctrine first recognized in *Chaplinsky* has been subsequently narrowed, *see* James L. Swanson, *Unholy Fire: Cross Burning, Symbolic Speech, and the First Amendment*: Virginia v. Black, 2003 CATO SUP. CT. REV. 81, 90 (2002-2003) (suggesting *only* that the fighting words category of unprotected speech has later been "diluted")*,* the expansiveness of the particular *exception* at issue does not detract from the integrity of the constitutional principle articulated there – that certain speech may be categorically unprotected under the First Amendment. Furthermore, that few types of speech have been so deemed under the balancing inquiry says nothing of the continuing vitality of the inquiry itself, especially when this principle continues to be cited by the Supreme Court. *See, e.g.*, *Virginia v. Black*, 538 U.S. 343, 358-59 (2003) (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)).

necessary between the evil sought to be prevented and the speech sought to be proscribed sufficient to render an entire category of speech unprotected. Because depictions of animal cruelty possess the integral characteristics of unprotected speech when considered under these precedents, we conclude that it escapes First Amendment protection.

a.

In discussing the contours of permissible content-based regulations, the Supreme Court has explained speech may be restricted when its "utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky*, 315 U.S. at 572. The Court reiterated this statement in *Ferber*: "[I]t is not rare that a content-based classification of speech has been accepted because it may be appropriately generalized that within the confines of the given classification, the evil to be restricted so overwhelmingly outweighs the expressive interests, if any, at stake, that no process of case-by-case adjudication is required." 458 U.S. at 763-64; *R.A.V.*, 505 U.S. at 382-83 ("From 1791 to the present, [] our society, like other free but civilized societies, has permitted

46

restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality") (internal quotations omitted). Justice Brennan, in his concurrence in *Ferber*, isolated the salient features: "[T]he limited classes of speech, the suppression of which does not raise serious First Amendment concerns, have two attributes. They are of exceedingly 'slight social value,' and the State has a compelling interest in their regulation." *Id.* at 776 (Brennan, J., concurring). These statements establish the constitutional floor: for speech to be unprotected, at a bare minimum, its value must be plainly outweighed by the Government's asserted interest. The speech in this case shares those repeatedly emphasized features.

1.

We agree with the Government that its interest in preventing animal cruelty is compelling.[19] The importance of

---

[19] While the Supreme Court has not established a precise test to determine when a particular interest is sufficiently important

this interest is readily apparent from the expansive regulatory framework that has been developed by state and federal legislatures to address the problem. These laws serve to protect not only the animals, but also the individuals who would commit the cruelty, and more generally, the morals of society.

Our nation's aversion to animal cruelty is deep-seated. Laws prohibiting cruelty to animals have existed in this country since 1641, when the Puritans of the Massachusetts Bay Colony enacted a law entitled "Off the Bruite Creature," which stated: "No man shall exercise any Tirranny or Crueltie towards any bruite Creature which are usuallie kept for man's use." Emily Stewart Leavitt, *Animals and Their Legal Rights: A Survey of American Laws from 1641 to 1970* 13 (Animal Welfare Institute

---

to warrant such a label, we note that it has found interests compelling in a wide variety of contexts. *See, e.g.*, *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003) ("attaining a diverse student body"); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118, 119 (1991) ("ensuring that victims of crime are compensated by those who harm them" and "that criminals do not profit from their crimes"); *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 226 (1989) ("[m]aintaining a stable political system"); *Federal Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496-97 (1985) (preventing governmental corruption).

48

1970).  In 1828, the first modern animal cruelty law was enacted in New York, and by 1913 every state had such a law.  *Id.* at 17; *see also* Pamela D. Frasch et al., *State Animal Anti-Cruelty Statutes: An Overview*, 5 Animal L. 69 (1999) (examining current state of anti-cruelty laws throughout the country).  As one early jurist stated: "[L]aws, and the enforcement or observance of laws, for the protection of dumb brutes from cruelty, are, in my judgment, among the best evidences of the justice and benevolence of men."  *Stephens v. State*, 3 So. 458, 458 (Miss. 1888).  These anti-cruelty laws have continued to evolve and proliferate.  In 1867, New York enacted a law outlawing animal fighting, David Favre & Vivien Tsang, *The Development of Anti-Cruelty Laws During the 1800's*, 1993 Det. C.L. Rev. 1, 16 (1993); and today, dogfighting is prohibited in all the fifty states, (App. at 155-57).  The fact that many states have taken the additional step of empowering local humane societies to directly enforce anti-cruelty laws further highlights the ardor with which our society seeks to prevent cruelty.  *See, e.g.*, 18 PA. CONS. STAT. § 5511(i) ("An agent of any society or association for the prevention of cruelty to animals, incorporated under the laws of the Commonwealth, shall have the same powers to initiate criminal proceedings provided for police officers by the Pennsylvania Rules of Criminal Procedure.  An agent of any society or association for the prevention of cruelty to animals, incorporated under the laws of this Commonwealth, shall have standing to request any court of competent jurisdiction to enjoin any violation of this section.").

49

Congress has also regularly enacted laws that protect animals from maltreatment, including, *inter alia*, laws that: proscribe animal fighting, 7 U.S.C. § 2156; require that livestock be slaughtered humanely, 7 U.S.C. § 1901; help establish humane guidelines governing the purchase, sale, and handling of animals, 7 U.S.C. § 2142; create standards to protect pets in pounds and shelters, 7 U.S.C. § 2158; prevent the "cruel and inhumane" soring[20] of horses, 15 U.S.C. §§ 1821-1831; protect free-roaming horses and burros from capture, branding, harassment, and death, 16 U.S.C. §§ 1331-1340; help conserve endangered species, 16 U.S.C. §§ 1531-43; and protect marine mammals, 16 U.S.C. §§ 1361-1421(h). The very statute before us illustrates Congress's solicitude for animal welfare. This interest is now so interwoven into the fabric of society that the Internal Revenue Code grants tax-exempt status to organizations striving to prevent cruelty to animals. *See* 26 U.S.C. § 501(c)(3).

These statutes are animated by concerns for animals, the

---

[20] The statute defines "sore" to cover any situation where a horse suffers because "an irritating or blistering agent has been applied, internally or externally, by a person to any limb of a horse, . . . any burn, cut, or laceration has been inflicted by a person on any limb of a horse, . . . [or] any tack, nail, screw, or chemical agent has been injected by a person into or used by a person on any limb of a horse." 15 U.S.C. § 1821.

aspirant abuser, and the public in general. It cannot be insignificant, as even the majority acknowledges, *see* Majority Op., *supra* at __ n.4, that the conduct underlying the depictions at hand is subject to criminal penalties in every state in the nation. This overwhelming body of law reflects the "widespread belief that animals, as living things, are entitled to certain minimal standards of treatment by humans," H.R. Rep. No. 106-397, at 4 (1999), and is powerful evidence of the importance of the governmental interest at stake. Indeed, the Supreme Court often cites to the prevalence of nationwide legislation on a matter as support for its conclusion that the asserted interest is sufficiently important as to be deemed compelling. *See, e.g.*, *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) ("There can be little doubt ... that the State has a compelling interest in ensuring that victims of crime are compensated by those who harm them. Every State has a body of tort law serving exactly this interest."); *Roberts v. United States Jaycees*, 468 U.S. 609, 624-25 (1984) (discussing various state laws prohibiting public accommodation discrimination as evidence of government's compelling interest in ensuring equal access); *Ferber*, 458 U.S. at 758 ("We shall not second-guess [the] legislative judgment [that preventing child exploitation and abuse is a compelling governmental objective] ... Suffice it to say that virtually all of the States and the United States have passed legislation proscribing the production of or otherwise combating 'child pornography.'"); *see also Roth v. United States*, 354 U.S. 476, 484-85 (1957) (concluding obscenity is "utterly without

51

redeeming social importance" based on "the universal judgment that obscenity should be restrained, [as] reflected in the international agreement of over 50 nations, in the obscenity laws of all of the 48 States, and in the 20 obscenity laws enacted by the Congress from 1842 to 1956") (internal footnotes omitted).

Less obvious, but no less important, cruelty to animals is a form of antisocial behavior that erodes public mores and can have a deleterious effect on the individual inflicting the harm. Early jurists accepted this contention implicitly. *See Broadway v. Am. Soc'y for the Prevention of Cruelty to Animals*, 15 Abb. Pr. (n.s.) 51 (N.Y. 1873) ("[The anti-cruelty statute] truly has its origin in the intent to save a just standard of humane feeling from being debased by pernicious effects of bad example – the human heart from being hardened by public and frequent exhibitions of cruelty to dumb creatures, committed to the care and which were created for the beneficial use of man."); *Commonwealth v. Turner*, 14 N.E. 130, 132 (Mass. 1887) ("The offense is against the public morals, which the commission of cruel and barbarous acts tends to corrupt."); *Waters v. People*, 46 P. 112, 113 (Colo. 1896) ("[The anti-cruelty statutes'] aim is not only to protect these animals, but to conserve public morals, both of which are undoubtedly proper subjects of legislation."). And empirical evidence now bears out that understanding. *See* H.R. Rep. No. 106-397, at 4 ("the increasing body of research which suggests that humans who kill or abuse others often do so as the culmination of a long pattern of abuse, which often begins

52

with the torture and killing of animals"); Brief for the Humane Society of the United States as *Amicus Curiae* in support of Appellee, at 4 n.10 (citation to various psychological studies discussing link between animal abuse and violent crime). These multi-layered sub-interests elucidate why preventing animal cruelty is so crucial.

Our nation has extended solicitude to animals from an early date, and has now established a rich tapestry of laws protecting animals from the cruelty we so abhor. This interest has nested itself so deeply into the core of our society – because the interest protects the animals themselves, humans, and public mores – that it warrants being labeled compelling.

Notwithstanding the majority's assertion, the Supreme Court in no way suggested to the contrary in *Church of the Lukumi Babalu Aye, Incorporated v. City of Hialeah*, 508 U.S. 520 (1993). In *Lukumi*, a church practicing the Santeria faith challenged city ordinances that prohibited its ritual slaughter of animals. *Id.* at 525-28. Although the state contended that the ordinances were motivated, *inter alia*, by the government's interest in preventing cruelty to animals, the Supreme Court struck down the ordinances. However, the ordinances there failed not because preventing cruelty to animals was not a

sufficiently paramount interest to be deemed compelling; rather, the Court found that the ordinances were so riddled with exceptions exempting all other killings except those practiced by Santeria adherents betrayed that the real rationale behind the prohibitions was an unconstitutional suppression of religion. *See, e.g.*, *id.* at 536 (noting the numerous exemptions for kosher and for other forms of animal killings, concluding "the burden of the ordinance, in practical terms, falls on Santeria adherents but almost no others"); *id.* at 542 (legislative history "discloses the object of the ordinances to target animal sacrifice by Santeria worshippers because of its religious motivation"). Indeed, Justice Blackmun was explicit in rejecting the majority's instant characterization of the decision:

> A harder case would be presented if petitioners were requesting an exemption from a generally applicable anticruelty law. *The result in the case before the Court today, and the fact that every Member of the Court concurs in that result, does not necessarily reflect this Court's views of the strength of a State's interest in prohibiting cruelty to animals.* This case does not present, and I therefore decline to reach, the question whether the Free Exercise Clause would require a religious exemption from a law that sincerely pursued the goal of protecting animals from cruel treatment.

54

*Id.* at 580 (Blackmun, J., concurring) (emphasis added). Thus, *Lukumi* does not contradict our conclusion that preventing animal cruelty is a compelling interest.[21]

Furthermore, insofar as we understand the majority to suggest that Congress cannot have a compelling interest to advance a goal when the subject of the regulation is not directly within its constitutional sphere of legislative authority, we must disagree with this novel proposition. A congressional act may certainly significantly advance a governmental interest of paramount significance, whether or not it does so directly. For example, Congress has sought to protect children from physical

---

[21] We further reject Stevens's assertion that the fact that society accepts the subjugation of animals for certain utilitarian purposes undercuts this conclusion. While sometimes the line between cruelty to animals and acceptable use of animals may be fine, our society has been living and legislating within these boundaries for centuries, since the advent of the first anti-cruelty law. Although an imprecise analogy, we would posit that preventing torture to humans is an undisputedly compelling interest despite the fact that under certain circumstances it is legal to put a person to death. *Compare Gregg v. Georgia*, 428 U.S. 153, 169 (1976), *with Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

harm by criminalizing the distribution of child pornography, *see* 18 U.S.C. § 2252, and to ensure the public's health and general welfare by enacting laws proscribing narcotics trafficking, *see* 21 U.S.C. § 201 *et seq*. That the states have already comprehensively criminalized child abuse and drug distribution in no way relegates the federal government's interests in doing the same to a subordinate level; the *means* through which Congress seeks to advance these interests – that is, pursuant to its Commerce Clause authority – has no bearing on the uncontroversial propositions that the interests implicated are nevertheless ones of the most paramount order. In short, whether a governmental interest is compelling does not, in our view, depend on the extent of the *particular* government's constitutional authority to directly regulate the core conduct at issue. *See United States v. Salerno*, 481 U.S. 739, 748-50 (1987) (upholding the Bail Reform Act based on the federal government's compelling interest in public safety, citing to cases establishing the individual *states's* interests in the same). Applied to this case, we do not think it proper for the majority to so narrowly redefine the Government's interest under section 48 – as implicating only the evils arising from the under-enforcement of state animal cruelty statutes – so as to diminish the importance of the Government's posited goals.

Nor do we find that section 48 is sufficiently under-inclusive as to undercut the Government's claim of the

56

significance of its interest.  *Cf. The Florida Star v. B.J.F.*, 491 U.S. 524, 541-42 (1989) (Scalia, J., concurring) ("a law cannot be regarded as protecting an interest 'of the highest order' ... when it leaves appreciable damage to that supposedly vital interest unprohibited").  Where the allegedly ignored evils are at the fringes of Congress's legislative authority, that section 48 does not criminalize the personal possession of depictions of animal cruelty or the intrastate trafficking of such materials does not render it impermissibly under-inclusive.[22]  On the contrary, Congress could have reasonably decided to focus its attention on purely interstate conduct, lest enforcement efforts be hampered by costly constitutional litigation.  This is especially so in light of the indication that the materials Congress sought to prohibit "were almost exclusively distributed for sale through interstate or foreign commerce."  H.R. Rep. No. 106-397, at 3 (summarizing witness testimony on nature of commercial

---

[22]  Indeed, the question of whether Congress exceeds its constitutional authority when regulating intrastate activities was one that had, until just recently, divided the circuits.  *Compare, e.g., United States v. Rodia*, 194 F.3d 465, 474-82 (3d Cir. 1999) (upholding statute prohibiting intrastate possession of child pornography made with materials that had traveled in interstate commerce) *with United States v. Smith*, 402 F.3d 1303, 1315-16 (11th Cir. 2005) (finding the same statute unconstitutional), *cert. granted and vacated*, 545 U.S. 1125 (2005), *and rev'd on remand*, 459 F.3d 1276, 1284-85 (11th Cir. 2006) (upholding statute as proper exercise of Commerce Clause power in light of *Gonzalez v. Raich*, 545 U.S. 1 (2005)).

market for depictions of animal cruelty).  We thus find no under-inclusion in section 48 sufficient to cast doubt on the Government's asserted interest here.  *Cf. Lukumi*, 508 U.S. at 543 (invalidating ordinances upon finding "[t]he underinclusion [] substantial, not inconsequential" where "[d]espite the city's proffered interest in preventing cruelty to animals, the ordinances are drafted with care to forbid few killings but those occasioned by religious sacrifice").[23]

---

[23] On the other hand, there is nothing over-inclusive about a statute that criminalizes the *knowing* distribution of depictions between locales where the particular depicted act is illegal in at least one of the two places.  On this point, we initially wish to note that the example given by the majority, *supra* at __, pertaining to Party Z is, in our opinion, somewhat incomplete. Under our reading of section 48, Party Z may be prosecuted for possessing a depiction of animal cruelty in Virginia originally made in the Northern Mariana Islands, even where the underlying activity depicted is legal in the Northern Mariana Islands, *only if* the act is otherwise illegal in Virginia or in the state or territory to which Party Z knowingly directs the sale of the depiction.  Were the acts legal in both Virginia and the Northern Mariana Islands, Party Z could *not* be prosecuted for selling the depiction in Virginia to someone back in the Northern Mariana Islands.

In any event, Congress was entitled to simply target the "visible apparatus" that is the commercial trafficking of the prohibited materials, especially where the underlying criminal acts are being carried out clandestinely so as to thwart detection and prosecution. *New York v. Ferber*, 458 U.S. 747, 760 (1982);

2.

Next, we find that the depictions of animal cruelty prohibited by section 48 also satisfy the second part of the fundamental First Amendment balancing inquiry because they have little or no social value. This is guaranteed by the very terms of the statute, which excepts speech that has "serious religious, political, scientific, educational, journalistic, historical, or artistic value" from its reach. 18 U.S.C. § 48(b). While this exception removes the possibility of the statute reaching serious works, we consider it unlikely that visual depictions of animal cruelty will often constitute an important and necessary part of a literary performance, a scientific or educational work, or political discourse. *See Ferber*, 458 U.S. at 762-63. Nor do we see any reason why, if some serious work were to demand a depiction of animal cruelty, either the cruelty or the animal could not be simulated. *See id.* at 763. Here, we have little trouble concluding that the depictions outlawed by section 48, by and large, can only have value to those with a

H.R. Rep. No. 106-397, at 3 (1999) (discussing witness testimony that the perpetrators and the locations of the actual acts of animal abuse were difficult to ascertain based on the tapes themselves, thereby posing significant enforcement problems for state authorities under existing anti-cruelty statutes).

59

morbid fascination with suffering and thus are of only *de minimis* value. *See* H.R. Rep. No. 106-397, at 5 ("The committee believes that no reasonable person would find any redeeming value in the material proscribed by [18 U.S.C. § 48]").

It is true, as a matter of First Amendment law, that the Government may not proscribe constitutionally protected speech merely by limiting its regulation to a subset of that speech devoid of serious value. On the other hand, however, the Supreme Court has made clear that a category of constitutionally *unprotected* speech may be regulated as long as the regulations do not extend to portions of speech within that category with "serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 24 (1973). Like in the case of obscenity, the relevant analytical starting point here is with the legislative judgment that the category of speech at issue – depictions of animals being intentionally tortured and killed – is of such minimal redeeming value as to render it unworthy of First Amendment protection. But acknowledging that certain subsets of these materials may have value for "religious, political, scientific, educational, journalistic, historical, or artistic" purposes, 18 U.S.C. § 48(b), Congress has circumscribed the scope of its regulation to only this category's plainly unprotected portions. Viewed in this light, section 48 is nothing more than an analogous codification of the *Miller v.*

*California* framework, tailored to the animal cruelty context. Thus, the analytical significance of the exceptions clause at issue here is not, as the majority suggests, an attempt to "constitutionalize" an otherwise unconstitutional restriction of *protected* speech; rather, it merely establishes the outer bounds for the permissible regulation of a category of otherwise *unprotected* speech, not unlike what the Supreme Court did in *Miller*.

We find that section 48 outlaws depictions that "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky*, 315 U.S. at 572. The speech outlawed by the statute at issue shares the salient characteristics of the other recognized categories of unprotected speech, and thus falls within the heartland of speech that may be proscribed based on its content. Having satisfied this threshold inquiry, we thus turn to a discussion of the *Ferber* considerations.

b.

61

We read *Ferber*, at its core, to stand for the narrow proposition that a category of speech may be constitutionally restricted where it depicts – and thus necessarily requires – the intentional infliction of physical harm on a class of especially vulnerable victims in violation of law, where the distribution of such depictions spurs their production but laws prohibiting the underlying acts are woefully under-enforced, and where the speech's social value is so *de minimus* as to be outweighed by the important governmental goal of protecting the victims. We find that the depictions of animal cruelty proscribed by section 48 possesses these essential attributes.[24]

In *Ferber*, the Supreme Court justified the prohibition of child pornography based on four grounds: (1) "a State's interest in safeguarding the physical and psychological well-being of a minor is compelling," *Ferber*, 458 U.S. at 756-57 (internal quotation marks omitted); (2) "[t]he distribution of photographs

---

[24] In analogizing to *Ferber*, we do not mean to suggest that the conduct underlying the creation of depictions of animal cruelty is of the same order as the reprehensible behavior implicit in child abuse. Nevertheless, insofar as *Ferber* highlighted the critical circumstances when a new category of constitutionally proscribable speech may warrant recognition, we find its discussion highly instructive to our resolution of the question at hand – the proper place that depictions of animal cruelty should have in our First Amendment jurisprudence.

and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children," *id.* at 759; (3) "[t]he advertising and selling of child pornography provide an economic motive for and are thus an integral part of the production of [child pornography]," *id.* at 761; and (4) "[t]he value of permitting live performances and photographic reproductions of children engaged in lewd sexual conduct is exceedingly modest, if not *de minimis*," *id.* at 762. We elaborate each of these four parts below and detail how depictions of animal cruelty implicate the same interests.

*First*, the Supreme Court recognized the state's interest in protecting minors as compelling. *Id.* at 756-57. As discussed at length above, we find preventing animal cruelty to also be a governmental interest of the most paramount importance. *See supra* section I.a.1.

*Second*, the Supreme Court explained that child pornography was an unprotected form of speech because of the intrinsic relationship between the distribution of child pornography and the sexual abuse of children, which it found existed in at least two ways. *Ferber*, 458 U.S. at 759. First, child pornography materials create a lasting record of the child abuse, and as the materials are distributed, the harm to the child

63

is exacerbated, *id.*, and second, because of the daunting obstacles in prosecuting the "low-profile, clandestine industry" responsible for the production of child pornography, targeting the more-visible distribution network was "the most expeditious if not the only practical method" of ensuring enforcement, *id.* at 760.

The speech at issue here is also intrinsically related to the underlying crime of animal cruelty, most clearly because its creation is also predicated on a violation of criminal law. Implicated by the depictions at hand is not the mere *prospect* of future crime, nor is the instant proscription premised on society's disapproval of the views underlying the depictions. *Cf. Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"). Unlike the virtual child pornography statute invalidated in *Ashcroft v. Free Speech Coalition*, the harm the Government is seeking to prevent here depends not "upon some unquantified potential for subsequent criminal acts" purportedly flowing from the prohibited depictions, 535 U.S. 234, 250 (2002), but arises directly and necessarily from the *creation* of the depictions itself.

In *Ferber*, the Supreme Court found an inextricable connection between child pornography and the underlying abuse based in part on its observation that the pornography's deleterious and stigmatizing effects transcend the single instance of abuse depicted. 458 U.S. at 759 n.10. We do not quarrel with the majority's statement that it would be difficult to directly analogize this ongoing psychological harm suffered by child abuse victims to that of animals. However, even a cursory consideration of well-documented circumstances surrounding animal abuse, such as those present in the dogfighting context, counsels toward the conclusion that the harms suffered by abused animals also extend far beyond that directly resulting from the single abusive act depicted. Indeed, dogs that are forced to fight are commonly the subjects of brutality and cruelty for the entire span of their lives: prior to the fights, they are intentionally emotionally abused and physically tortured in order to predispose them to violence; after the fights, dogs that do not perform well are not infrequently left to die untreated from their injuries or are simply executed. *See generally* Brief for the Humane Society of the United States as *Amicus Curiae*, at 2-3 (citing various authorities on the treatment of dogs involved in dogfighting). Further, the creation of the depictions at issue often spells the actual end of the lives of the animals involved. *See* H.R. Rep. No. 106-397, at 2 (describing crush videos as "videotapes ... depicting [] small animals being slowly crushed to death"); *see also* H.R. Rep. No. 94-801, at 9 (1976) ("Dog fighting itself is a grisly business in which two dogs either trained specifically for the purpose or maddened by drugs

65

and abuse are set upon one another and required to fight, usually to the death of at least one and frequently both animals."). Thus, while animals may not suffer psychological harm merely because of the continued existence of the depictions as permanent records of their abuse, that significant attendant harms (both leading up to the abuse and following from it) emanate from the single instance of depicted cruelty nevertheless supports our finding here that the prohibited depictions are intrinsically linked to the underlying abuse.

In addition, law enforcement officials face similar difficulties in prosecuting the creation of animal cruelty depictions as they do in policing child pornography, and Congress could have thus reasonably concluded that targeting the distributors would be the most effective way of drying up the animal-cruelty depictions market. In particular, police struggle to prosecute those involved in crush videos because the videos are generally created by a bare-boned, clandestine staff; the woman doing the crushing is filmed in a manner that shields her identity, and the location of the action is imperceptible. *See* H.R. Rep. No. 106-397, at 3. Similarly, individuals involved in dogfights are also elaborately insulated from law enforcement. *See* App. at 476-77 (expert witness describing the difficulty of infiltrating a dogfighting group where each member knows the others); *see also* Susan E. Davis, *Blood Sport: Dog Fighting Is Big Business in California, and Just About Impossible to Stop*,

17 Cal. Law. 44, 84 (1997) (explaining the difficulties of gaining access to dogfighting rings, as organizers often require newcomers to fight a dog before accepting that person). Indeed, in the videos at issue in this case, while the faces of the spectators of the dogfights taking place in Japan were sometimes clearly pictured (e.g., in "Japan Pit Fights"), Stevens himself stated in "Pick-A-Winna" that he purposefully edited out the faces of the handlers involved in the fights occurring in the United States.[25] Therefore, we must disagree with the majority's characterization of the Government's claims pertaining to the difficulties in the enforcement of state animal cruelty statutes as "empirically inaccurate." As is evident in the record before us, the same policing concerns that necessitated a focus on the more-visible distribution network in *Ferber* are present in this case. Accordingly, we conclude that the creation and distribution of depictions of animal cruelty is intrinsically related to animal cruelty so as to weigh in favor of its prohibition.

*Third*, the Supreme Court held in *Ferber* that the advertising and sale of child pornography must be targeted since

---

[25] And although "Catch Dogs" contains substantial footage of dogs physically restraining wild hogs, we note nevertheless that the video also plainly depicts a Japanese dogfight in its entirety.

they "provide an economic motive for and are thus an integral part of the production of such materials." 458 U.S. at 761. Because the First Amendment does not protect speech that forms an integral part of a criminal violation, and because of the glaring under-enforcement of the underlying laws prohibiting the production of child pornography, the *Ferber* Court concluded that these considerations counseled towards permitting regulation of the pornographic materials. *Id.* at 762.

These factors are self-evidently present in the instant case. As discussed, substantial obstacles exist in effectively detecting and prosecuting those directly involved in the creation of animal cruelty depictions. Furthermore, the record here amply demonstrates that a thriving market exists for depictions of animal cruelty: Crush videos and dogfighting videos are advertised and sold in copious amounts over the internet and through magazines.[26] *See* 145 Cong. Rec. S15220-03 (1999) (noting that there are over 2,000 crush-video titles available in the marketplace, priced from $15 to $300); App. at 447-49

---

[26] Caselaw demonstrates that it is not unusual for dog fights to be filmed. *See Ash v. State*, 718 S.W.2d 930, 931 (Ark. 1986) (describing police raid of dogfight where fight was being videotaped); *People v. Lambert*, Nos. 2001QN043659, 2001QN043660, 2001QU043661, 2001QN043662, 2001QU043663, 2002 WL 1769931, at *2 (N.Y. Crim. Ct. June 18, 2002) (same); *State v. Shelton*, 741 So. 2d 473, 474 (Ala. Crim. App. 1999) (same).

68

(witness explaining that the *Sporting Dog Journal* reports results of illegal dogfights and runs advertisements for dogfighting videos); PSR 6 (showing that Stevens had sold almost 700 videos depicting dogfights in two-and-a-half years for which he earned over $20,000). This evidence establishes the existence of a lucrative market for depictions of animal cruelty, which in turn provides a powerful incentive to individuals to create videos depicting animal cruelty.

In our view, the presence of an economic motive driving the production of depictions of animals being tortured or killed is perhaps the critical consideration that distinguishes the speech at issue here from ordinary depictions of criminal activities. A decision here allowing prohibition of the distribution of depictions of animal abuse will no more threaten the examples of speech posited by Stevens – crime scene photographs and surveillance videos – than did the Supreme Court's decision in *Ferber*. Stevens's examples are easily distinguishable from the speech prohibited by section 48 as they plainly have more than *de minimis* value; crime scene photographs, for instance, are eminently useful to police officers. Furthermore, most critically, no commercial market exists for depictions of run-of-the-mill criminal activities so as to incentivize the commission of the underlying illegal acts; there thus is little danger that individuals will be directly motivated to physically harm others in order to create depictions of the same solely in hopes of commercial

gain.

*Fourth*, the Supreme Court justified its restriction in *Ferber* on the fact that the value of child pornography is *de minimis*. 458 U.S. at 762. The Court considered it unlikely that such depictions would be an important or necessary part of scientific, literary, or educational works, and in the off-chance that such was necessary, they could simply be simulated. *Id.* at 762-63. While we have already articulated our reasons for concluding that depictions of animal cruelty are of *de minimis* value, *see supra* section I.a.2, we stress here that this case is even clearer than that in *Ferber* because section 48, unlike the statute at issue in *Ferber*, already expressly excludes depictions that have any serious value. Thus, there is simply no potential that the present statute will reach any work that plays an important role in the world of ideas.

The speech at issue in this case possesses the essential attributes of unprotected speech identified generally in *Chaplinsky* and of child pornography as discussed in *Ferber*. To reiterate, the Government has a compelling interest in eradicating animal cruelty, depictions of animal cruelty are intrinsically related to the underlying animal cruelty, the market for videos of animal cruelty incentivizes the commission of acts

70

of animal cruelty, and such depictions are of *de minimis* value. In reaching this decision, however, we emphasize that we have before us, not a statute broadly purporting to ban all depictions of criminal acts, but merely one prohibiting depictions of a narrow subclass of depraved acts committed against an uniquely vulnerable and helpless class of victims. As such, we deem it unlikely that our ruling as to the constitutionality of the latter would have broad negative repercussions to First Amendment freedoms. Accordingly, because Congress may proscribe depictions of animal cruelty without running afoul of the First Amendment, we would reject Stevens's challenge to the constitutional validity of 18 U.S.C. § 48.

II.

Section 48 is also not unconstitutionally overbroad. The overbreadth doctrine is designed to abate the "possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Overbreadth is fundamentally concerned with striking a delicate balance between the "competing social costs" of deterring people from engaging in constitutionally protected conduct and of ensuring that certain criminal behavior is

regulated. *United States v. Williams*, 128 S. Ct. 1830, 1838 (2008). Resort to this doctrine is "strong medicine that is not to be casually employed." *Id.* (quoting *Los Angeles Police Dep't. v. United Reporting Publishing Corp.*, 528 U.S. 32, 39 (1999)) (internal quotations omitted).

As the Supreme Court recently emphasized: "In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* (emphasis in original). Courts should invalidate a statute on overbreadth grounds only when the law "reaches a *substantial* number of impermissible applications," *Ferber*, 458 U.S. at 772 (emphasis added). Thus, "[t]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Williams*, 128 S. Ct. at 1844 (quoting *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)). Rather, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Taxpayers for Vincent*, 466 U.S. at 801. There is no such substantial overbreadth here.

72

Stevens first argues that the statute is overbroad because it criminalizes depictions of conduct that was not illegal when or where it occurred, such as videos of dogfights in Japan, where dogfighting is legal, or videos that were produced in the United States before dogfighting was outlawed. However, such speech is within the statute's legitimate scope. In *Ferber*, the Court held that a "State is not barred by the First Amendment from prohibiting the distribution of unprotected materials produced outside the State," 458 U.S. at 765-66, because "the maintenance of the market itself 'leaves open the financial conduit by which the production of such material is funded and materially increases the risk that [local] children will be injured,'" *id.* at 766 n.19 (quoting *People v. Ferber*, 422 N.E.2d 523, 531 (N.Y. 1981) (Jasen, J., dissenting)); *see also* 18 U.S.C. § 2252A (federal child pornography statute explicitly reaches works produced overseas). The same interests are implicated here: so long as the industry peddling depictions of animal cruelty survives, there remains a financial incentive to create more videos of animal cruelty within this country. The state of the law numerous years ago in this country, or that in foreign jurisdictions is simply irrelevant to this consideration. The Government may legitimately endeavor to quash the entire industry in all its manifestations. Furthermore, because the difficulty in determining where or when the underlying acts of animal cruelty occurred was part of Congress's motivation for enacting section 48 in the first place, *see* H.R. Rep. No. 106-397, at 2, excepting depictions that occurred at a time or in a place where the conduct was not illegal would essentially gut

73

the instant statute.

Stevens also argues that the statute is overbroad because it reaches individuals who took no part in the underlying conduct.  This argument is likewise foreclosed by *Ferber*, where the Court ruled that it was permissible for the government to annihilate the child pornography market at all levels, which included penalizing distributors.  458 U.S. at 759-60.  Similarly, for the Government to extinguish the market for depictions of animal cruelty, it must be allowed to attack its most visible apparatus – the commercial distribution network.

Stevens's final argument that the statute is overbroad because it could extend to technical violations of hunting and fishing statutes is also unpersuasive.  The Supreme Court recently rejected similar contentions in upholding 18 U.S.C. § 2252A(a)(3)(B) – a federal statute criminalizing the promotion and possession of child pornography – against an overbreadth challenge.  *Williams*, 128 S. Ct. at 1843-45.  While acknowledging that the plain language of the statute could be read to criminalize the act of turning child pornography over to law enforcement, the Court nevertheless stated that as it was unaware of any prosecutions for such conduct under analogous state statutes, there was simply no real threat that such activity

74

would be deterred by the federal prohibition. *Id.* at 1843-44. Furthermore, that the statute could also apply to documentary footage of foreign war atrocities did not render it facially unconstitutional; even if such an application violated the First Amendment, "the existence of that exception would not establish that the statute is *substantially* overbroad." *Id.* at 1844 (emphasis in original).

Turning to the statute at hand, we are unable to imagine the circumstances that would have to coalesce for such a video to come within the reaches of section 48, especially in light of its exceptions clause. *See id.* at 1843 (remarking the examples posited "demonstrates nothing so forcefully as the tendency of our overbreadth doctrine to summon forth an endless stream of fanciful hypotheticals"). In short, there is simply no "realistic danger" that the challenged statute will deter such depictions. *Id.* at 1844 (quoting *New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 11 (1988)). Moreover, even if technical violations were to slip through the section 48(b) bulwark, we are confident that they would amount to no more than a "tiny fraction" of the depictions subject to the statute, which thus may "be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Ferber*, 458 U.S. at 773-74 (quoting *Broadrick*, 413 U.S. at 615-616). Accordingly, section 48 is not substantially overbroad.

III.

Finally, Stevens contends that the statute is unconstitutionally vague. A statute is void on vagueness grounds if it: (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits"; or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Section 48 is not unconstitutionally vague under either standard.

Stevens's primary argument, that the statute is necessarily vague because the definition of "depiction of animal cruelty" is predicated on state law is unavailing. A federal statute is not rendered unconstitutionally vague merely because it incorporates state law; to the contrary, such is a legitimate drafting technique frequently utilized by Congress. *See, e.g.*, 18 U.S.C. § 922 (prohibiting selling "firearm to any person in any State where the purchase or possession by such person of such firearm would be in violation of any State law"); 18 U.S.C. § 1202(b) (criminalizing the transfer of proceeds from any kidnapping punishable under state law). Not surprisingly, courts consistently reject due process challenges premised on incorporation grounds. *See, e.g.*, *United States v. Iverson*, 162

F.3d 1015, 1021 (9th Cir. 1998) ("a statute is not unconstitutionally vague merely because it incorporates other provisions by reference; a reasonable person of ordinary intelligence would consult the incorporated provisions"); *United States v. Tripp*, 782 F.2d 38, 42 (6th Cir. 1986) ("[n]or is there any constitutional objection to a criminal statute that incorporates state law for purposes of defining illegal conduct"); *United States v. Morrison*, 531 F.2d 1089, 1093 (1st Cir. 1976) (same).

Stevens's next contention is that section 48 is void-for-vagueness because the word "animal" is defined differently in different states. We reject this argument as plainly against the weight of legal authority. *See, e.g.*, *Tripp*, 782 F.2d at 42 (federal statute does not violate due process in incorporating state laws "even if the result is that conduct that is lawful under the federal statute in one state is unlawful in another"); *United States v. Abramson*, 553 F.2d 1164, 1173 (8th Cir. 1977) (same); *United States v. Schwartz*, 398 F.2d 464, 467 (7th Cir. 1968) (federal statute "does not violate the Fifth Amendment even though there is a lack of uniformity among the state laws upon which it depends"). Notwithstanding Stevens's claims to the contrary, section 48 is not unconstitutionally vague.

IV.

To be sure, we are not insensitive to the concerns implicated when a federal court declares an entire category of speech outside the purview of the First Amendment. Nor can we disagree with our majority colleagues that the judicial power in this realm of constitutional law is one that should be wielded sparingly, and then only with great deliberation and care. However, we know of no principle that lower courts should refrain from developing our nation's free speech jurisprudence and decline to analogize and apply the Supreme Court's precedents in this area without first receiving the express permission to do so. In the absence of a Supreme Court pronouncement to the contrary, and in light of the unique circumstances before us, we believe our determination – that the depictions of animal cruelty prohibited by 18 U.S.C. § 48 are not protected by the Constitution – both faithfully discharges our judicial obligation to duly advance the law's development when appropriate to do so, and comports with the Supreme Court's articulation of the limits of the First Amendment's protections as set forth in *Chaplinsky* and *Ferber*.

In conclusion, 18 U.S.C. § 48 significantly advances the Government's compelling interest in protecting animals from

wanton acts of cruelty, and the depictions it prohibits are of such minimal social value as to render this narrow category of speech outside the scope of the First Amendment. Furthermore, the statute is neither substantially overbroad nor unconstitutionally vague. Thus, we would hold that section 48 is a valid congressional act, and would therefore affirm Stevens's conviction.