Justice Alito,
dissenting.
The Court strikes down in its entirety a valuable statute, 18 U. S. C. § 48, that was enacted not to suppress speech, but to prevent horrific acts of animal cruelty — in particular, the creation and commercial exploitation of “crush videos,” a form of depraved entertainment that has no social value. The Court’s approach, which has the practical effect of legalizing the sale of such videos and is thus likely to spur a resumption of their production, is unwarranted. Respondent was convicted under §48 for selling videos depicting dogfights. On appeal, he argued, among other things, that §48 is unconstitutional as applied to the facts of this case, and he highlighted features of those videos that might distinguish them from other dogfight videos brought to our attention.[1] *483 The Court of Appeals — incorrectly, in my view — declined to decide whether §48 is unconstitutional as applied to respondent’s videos and instead reached out to hold that the statute is facially invalid. Today’s decision does not endorse the Court of Appeals’ reasoning, but it nevertheless strikes down §48 using what has been aptly termed the “strong medicine” of the overbreadth doctrine, United States v. Williams, 553 U. S. 285, 293 (2008) (internal quotation marks omitted), a potion that generally should be administered only as “a last resort,” Los Angeles Police Dept. v. United Reporting Publishing Corp., 528 U. S. 32, 39 (1999) (internal quotation marks omitted).
Instead of applying the doctrine of overbreadth, I would vacate the decision below and instruct the Court of Appeals on remand to decide whether the videos that respondent sold are constitutionally protected. If the question of over-breadth is to be decided, however, I do not think the present record supports the Court’s conclusion that § 48 bans a substantial quantity of protected speech.
I
A party seeking to challenge the constitutionality of a statute generally must show that the statute violates the party’s own rights. New York v. Ferber, 458 U. S. 747, 767 (1982). The First Amendment overbreadth doctrine carves out a narrow exception to that general rule. See id., at 768; Broadrick v. Oklahoma, 413 U. S. 601, 611-612 (1973). Because an overly broad law may deter constitutionally protected speech, the overbreadth doctrine allows a party to *484 whom the law may constitutionally be applied to challenge the statute on the ground that it violates the First Amendment rights of others. See, e. g., Board of Trustees of State Univ. of N. Y. v. Fox, 492 U. S. 469, 483 (1989) (“Ordinarily, the principal advantage of the overbreadth doctrine for a litigant is that it enables him to benefit from the statute’s unlawful application to someone else”); see also Ohralik v. Ohio State Bar Assn., 436 U. S. 447, 462, n. 20 (1978) (describing the doctrine as one “under which a person may challenge a statute that infringes protected speech even if the statute constitutionally might be applied to him”).
The “strong medicine” of overbreadth invalidation need not and generally should not be administered when the statute under attack is unconstitutional as applied to the challenger before the court. As we said in Fox, supra, at 484-485, “[i]t is not the usual judicial practice, . . . nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily — that is, before it is determined that the statute would be valid as applied.” Accord, New York State Club Assn., Inc. v. City of New York, 487 U. S. 1, 11 (1988); see also Broadrick, supra, at 613; United Reporting Publishing Corp., supra, at 45 (Stevens, J., dissenting).
I see no reason to depart here from the generally preferred procedure of considering the question of overbreadth only as a last resort.[2] Because the Court has addressed the overbreadth question, however, I will explain why I do not think that the record supports the conclusion that §48, when properly interpreted, is overly broad.
II
The overbreadth doctrine “strike[s] a balance between competing social costs.” Williams, 553 U. S., at 292. Specifically, the doctrine seeks to balance the “harmful effects” of “invalidating a law that in some of its applications is per *485 fectly constitutional” against the possibility that “the threat of enforcement of an overbroad law [will] dete[r] people from engaging in constitutionally protected speech.” Ibid. “In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute’s overbreadth be substantial, not only in an absolute sense, but also relative to the statute’s plainly legitimate sweep.” Ibid.
In determining whether a statute’s overbreadth is substantial, we consider a statute’s application to real-world conduct, not fanciful hypothetieals. See, e. g., id., at 301-302; see also Ferber, supra, at 773; Houston v. Hill, 482 U. S. 451, 466-467 (1987). Accordingly, we have repeatedly emphasized that an overbreadth claimant bears the burden of demonstrating, “from the text of [the law] and from actual fact,” that substantial overbreadth exists. Virginia v. Hicks, 539 U. S. 113, 122 (2003) (quoting New York State Club Assn., supra, at 14; emphasis added; internal quotation marks omitted; alteration in original). Similarly, “there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.” Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U. S. 789, 801 (1984) (emphasis added).
III
In holding that §48 violates the overbreadth rule, the Court declines to decide whether, as the Government maintains, § 48 is constitutional as applied to two broad categories of depictions that exist in the real world: crush videos and depictions of deadly animal fights. See ante, at 473, 481. Instead, the Court tacitly assumes for the sake of argument that § 48 is valid as applied to these depictions, but the Court concludes that §48 reaches too much protected speech to survive. The Court relies primarily on depictions of hunters killing or wounding game and depictions of animals being slaughtered for food. I address the Court’s examples below.
*486 A
I turn first to depictions of hunting. As the Court notes, photographs and videos of hunters shooting game are common. See ante, at 476. But hunting is legal in all 50 States, and §48 applies only to a depiction of conduct that is illegal in the jurisdiction in which the depiction is created, sold, or possessed. §§ 48(a), (c). Therefore, in all 50 States, the creation, sale, or possession for sale of the vast majority of hunting depictions indisputably falls outside §48’s reach.
Straining to find overbreadth, the Court suggests that §48 prohibits the sale or possession in the District of Columbia of any depiction of hunting because the District — undoubtedly because of its urban character — does not permit hunting within its boundaries. Ante, at 475-476. The Court also suggests that, because some States prohibit a particular type of hunting (e. g., hunting with a crossbow or “canned” hunting) or the hunting of a particular animal (e. g., the “sharp-tailed grouse”), §48 makes it illegal for persons in such States to sell or possess for sale a depiction of hunting that was perfectly legal in the State in which the hunting took place. See ante, at 475-477.
The Court’s interpretation is seriously flawed. “When a federal court is dealing with a federal statute challenged as overbroad, it should, of course, construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction.” Ferber, 458 U. S., at 769, n. 24. See also Williams, supra, at 307 (Stevens, J., concurring) (“[T]o the extent the statutory text alone is unclear, our duty to avoid constitutional objections makes it especially appropriate to look beyond the text in order to ascertain the intent of its drafters”).
Applying this canon, I would hold that §48 does not apply to depictions of hunting. First, because §48 targets depictions of “animal cruelty,” I would interpret that term to apply only to depictions involving acts of animal cruelty as defined by applicable state or federal law, not to depictions *487 of acts that happen to be illegal for reasons having nothing to do with the prevention of animal cruelty. See ante, at 475 (interpreting “[t]he text of § 48(c)” to ban a depiction of “the humane slaughter of a stolen cow”). Virtually all state laws prohibiting animal cruelty either expressly define the term “animal” to exclude wildlife or else specifically exempt lawful hunting activities,[3] so the statutory prohibition set forth in § 48(a) may reasonably be interpreted not to reach most if not all hunting depictions.
Second, even if the hunting of wild animals were otherwise covered by § 48(a), I would hold that hunting depictions fall within the exception in § 48(b) for depictions that have “serious” (i. e., not “trifling”[4]) “scientific,” “educational,” or “historical” value. While there are certainly those who find hunting objectionable, the predominant view in this country has long been that hunting serves many important values, and it is clear that Congress shares that view. Since 1972, when Congress called upon the President to designate a National Hunting and Fishing Day, see S. J. Res. 117, 92d Cong., 2d Sess. (1972), 86 Stat. 133, Presidents have regularly issued proclamations extolling the values served by hunting. See Presidential Proclamation No. 8421, 74 Fed. Reg. 49305 (Pres. Obama 2009) (hunting and fishing are “ageless pursuits” that promote “the conservation and restoration of numerous species and their natural habitats”); Presidential *488 Proclamation No. 8295, 73 Fed. Reg. 57233 (Pres. Bush 2008) (hunters and anglers “add to . our heritage and keep our wildlife populations healthy and strong,” and “are among our foremost conservationists”); Presidential Proclamation No. 7822, 69 Fed. Reg. 59539 (Pres. Bush 2004) (hunting and fishing are “an important part of our Nation’s heritage,” and “America’s hunters and anglers represent the great spirit of our country”); Presidential Proclamation No. 4682, 44 Fed. Reg. 53149 (Pres. Carter 1979) (hunting promotes conservation and an appreciation of “healthy recreation, peaceful solitude and closeness to nature”); Presidential Proclamation No. 4318, 39 Fed. Reg. 35315 (Pres. Ford 1974) (hunting furthers “appreciation and respect for nature” and preservation of the environment). Thus, it is widely thought that hunting has “scientific” value in that it promotes conservation, “historical” value in that it provides a link to past times when hunting played a critical role in daily life, and “educational” value in that it furthers the understanding and appreciation of nature and our country’s past and instills valuable character traits. And if hunting itself is widely thought to serve these values, then it takes but a small additional step to conclude that depictions of hunting make a nontrivial contribution to the exchange of ideas. Accordingly, I would hold that hunting depictions fall comfortably within the exception set out in § 48(b).
I do not have the slightest doubt that Congress, in enacting § 48, had no intention of restricting the creation, sale, or possession of depictions of hunting. Proponents of the law made this point clearly. See H. R. Rep. No. 106-397, p. 8 (1999) (hereinafter H. R. Rep.) (“[D]epictions of ordinary hunting and fishing activities do not fall within the scope of the statute”); 145 Cong. Rec. 25894 (1999) (Rep. McCollum) (“[T]he sale of depictions of legal activities, such as hunting and fishing, would not be illegal under this bill”); id., at 25895 (Rep. Smith) (“[L]et us be clear as to what this legislation will not do. It will in no way prohibit hunting, fishing, or wildlife videos”). Indeed, even opponents acknowledged *489 that § 48 was not intended to reach ordinary hunting depictions. See ibid. (Rep. Scott); id., at 25897 (Rep. Paul).
For these reasons, I am convinced that §48 has no application to depictions of hunting. But even if § 48 did impermissibly reach the sale or possession of depictions of hunting in a few unusual situations (for example, the sale in Oregon of a depiction of hunting with a crossbow in Virginia or the sale in Washington State of the hunting of a sharp-tailed grouse in Idaho, see ante, at 476-477), those isolated applications would hardly show that §48 bans a substantial amount of protected speech.
B
Although the Court’s overbreadth analysis rests primarily on the proposition that §48 substantially restricts the sale and possession of hunting depictions, the Court cites a few additional examples, including depictions of methods of slaughter and the docking of the tails of dairy cows. See ante, at 477.
Such examples do not show that the statute is substantially overbroad, for two reasons. First, as explained above, §48 can reasonably be construed to apply only to depictions involving acts of animal cruelty as defined by applicable state or federal law, and anticruelty laws do not ban the sorts of acts depicted in the Court’s hypotheticals. See, e. g., Idaho Code §25-3514 (Lexis 2000) (“No part of this chapter [prohibiting cruelty to animals] shall be construed as interfering with or allowing interference with . .. [t]he humane slaughter of any animal normally and commonly raised as food, or for production of fiber . . . [or] [n]ormal or accepted practices of . . . animal husbandry”); Kan. Stat. Ann. §21 — 4310(b) (2007) (“The provisions of this section shall not apply . . . with respect to farm animals, normal or accepted practices of animal husbandry, including the normal and accepted practices for the slaughter of such animals”); Md. Crim. Law Code Ann. § 10-603 (Lexis 2002) (sections prohibiting animal cruelty “do not apply to ... customary and normal veterinary *490 and agricultural husbandry practices including dehorning, castration, tail docking, and limit feeding”).
Second, nothing in the record suggests that anyone has ever created, sold, or possessed for sale a depiction of the slaughter of food animals or of the docking of the tails of dairy cows that would not easily qualify under the exception set out in § 48(b). Depictions created to show proper methods of slaughter or tail docking would presumably have serious “educational” value, and depictions created to focus attention on methods thought to be inhumane or otherwise objectionable would presumably have either serious “educational” or “journalistic” value or both. In short, the Court’s examples of depictions involving the docking of tails and humane slaughter do not show that § 48 suffers from any over-breadth, much less substantial overbreadth.
The Court notes, finally, that cockfighting, which is illegal in all States, is still legal in Puerto Rico, ante, at 477, and I take the Court’s point to be that it would be impermissible to ban the creation, sale, or possession in Puerto Rico of a depiction of a cockfight that was legally staged in Puerto Rico.[5] But assuming for the sake of argument that this is correct, this veritable sliver of unconstitutionality would not be enough to justify striking down §48 in toto.
In sum, we have a duty to interpret §48 so as to avoid serious constitutional concerns, and §48 may reasonably be construed not to reach almost all, if not all, of the depictions that the Court finds constitutionally protected. Thus, §48 does not appear to have a large number of unconstitutional *491 applications. Invalidation for overbreadth is appropriate only if the challenged statute suffers from substantial over-breadth — judged not just in absolute terms, but in relation to the statute’s “plainly legitimate sweep.” Williams, 553 U. S., at 292. As I explain in the following Part, § 48 has a substantial core of constitutionally permissible applications.
IV
A
1
As the Court of Appeals recognized, “the primary conduct that Congress sought to address through its passage [of § 48] was the creation, sale, or possession of ‘crush videos.’ ” 533 F. 3d 218, 222 (CA3 2008) (en banc). A sample crush video, which has been lodged with the Clerk, records the following event:
“[A] kitten, secured to the ground, watches and shrieks in pain as a woman thrusts her high-heeled shoe into its body, slams her heel into the kitten’s eye socket and mouth loudly fracturing its skull, and stomps repeatedly on the animal’s head. The kitten hemorrhages blood, screams blindly in pain, and is ultimately left dead in a moist pile of blood-sóaked hair and bone.” Brief for Humane Society of United States as Amicus Curiae 2 (hereinafter Humane Society Brief).
It is undisputed that the conduct depicted in crush videos may constitutionally be prohibited. All 50 States and the District of Columbia have enacted statutes prohibiting animal cruelty. See 533 F. 3d, at 223, and n. 4 (citing statutes); H. R. Rep., at 3. But before the enactment of §48, the underlying conduct depicted in crush videos was nearly impossible to prosecute. These videos, which “often appeal to persons with a very specific sexual fetish,” id., at 2, were made in secret, generally without a live audience, and “the faces of the women inflicting the torture in the material often were not shown, nor could the location of the place where *492 the cruelty was being inflicted or the date of the activity be ascertained from the depiction,” id., at 3. Thus, law enforcement authorities often were not able to identify the parties responsible for the torture. See Punishing Depictions of Animal Cruelty and the Federal Prisoner Health Care Co-Payment Act of 1999: Hearing before the Subcommittee on Crime of the House Committee on the Judiciary, 106th Cong., 1st Sess., 1 (1999) (hereinafter Hearing on Depictions of Animal Cruelty). In the rare instances in which it was possible to identify and find the perpetrators, they “often were able to successfully assert as a defense that the State could not prove its jurisdiction over the place where the act occurred or that the actions depicted took place within the time specified in the State statute of limitations.” H. R. Rep., at 3; see also 145 Cong. Rec. 25896 (Rep. Gallegly) (“[I]t is the prosecutors from around this country, Federal prosecutors as well as State prosecutors, that have made an appeal to us for this”); Hearing on Depictions of Animal Cruelty 21 (“If the production of the video is not discovered during the actual filming, then prosecution for the offense is virtually impossible without a cooperative eyewitness to the filming or an undercover police operation ”); id., at 34-35 (discussing example of case in which state prosecutor “had the defendant telling us he produced these videos,” but where prosecution was not possible because the State could not prove where or when the tape was made).
In light of the practical problems thwarting the prosecution of the creators of crush videos under state animal cruelty laws, Congress concluded that the only effective way of stopping the underlying criminal conduct was to prohibit the commercial exploitation of the videos of that conduct. And Congress’ strategy appears to have been vindicated. We are told that “[b]y 2007, sponsors of §48 declared the crush video industry dead. Even overseas websites shut down in the wake of §48. Now, after the Third Circuit’s decision [facially invalidating the statute], crush videos are *493 already back online.” Humane Society Brief 5 (citations omitted).
2
The First Amendment protects freedom of speech, but it most certainly does not protect violent criminal conduct, even if engaged in for expressive purposes. Crush videos present a highly unusual free speech issue because they are so closely linked with violent criminal conduct. The videos record the commission of violent criminal acts, and it appears that these crimes are committed for the sole purpose of creating the videos. In addition, as noted above, Congress was presented with compelling evidence that the only way of preventing these crimes was to target the sale of the videos. Under these circumstances, I cannot believe that the First Amendment commands Congress to step aside and allow the underlying crimes to continue.
The most relevant of our prior decisions is Ferber, 458 U. S. 747, which concerned child pornography. The Court there held that child pornography is not protected speech, and I believe that Ferber’s reasoning dictates a similar conclusion here.
In Ferber, an important factor — I would say the most important factor — was that child pornography involves the commission of a crime that inflicts severe personal injury to the “children who are made to engage in sexual conduct for commercial purposes.” Id., at 758 (internal quotation marks omitted). The Ferber Court repeatedly described the production of child pornography as child “abuse,” “molestation,” or “exploitation.” See, e.g., id., at 749 (“In recent years, the exploitive use of children in the production of pornography has become a serious national problem”); id., at 758, n. 9 (“Sexual molestation by adults is often involved in the production of child sexual performances”). As later noted in Ashcroft v. Free Speech Coalition, 535 U. S. 234, 249 (2002), in Ferber “[t]he production of the work, not its content, was the target of the statute.” See also 535 U. S., at *494 250 (Ferber involved “speech that itself is the record of sexual abuse”).
Second, Ferber emphasized the fact that these underlying crimes could not be effectively combated without targeting the distribution of child pornography. As the Court put it, “the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled.” 458 U. S., at 759. The Court added:
“[T]here is no serious contention that the legislature was unjustified in believing that it is difficult, if not impossible, to halt the exploitation of children by pursuing only those who produce the photographs and movies____ The most expeditious if not the only practical method of law enforcement may be to dry up the market for this material by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product.” Id., at 759-760.
See also id., at 761 (“The advertising and selling of child pornography provide an economic motive for and are thus an integral part of the production of such materials”).
Third, the Ferber Court noted that the value of child pornography “is exceedingly modest, if not de minimis,” and that any such value was “overwhelmingly outweigh[ed]” by “the evil to be restricted.” Id., at 762-763.
All three of these characteristics, are shared by §48, as applied to crush videos. First, the conduct' depicted in crush videos is criminal in every State and the District of Columbia. Thus, any crush video made in this country records the actual commission of a criminal act that inflicts severe physical injury and excruciating pain and ultimately results in death. Those who record the underlying criminal acts are likely to be criminally culpable, either as aiders and abettors or conspirators. And in the tight and secretive market for these videos, some who sell the videos or possess *495 them with the intent to make a profit may be similarly culpable. (For example, in some cases, crush videos were commissioned by purchasers who specified the details of the acts that they wanted to see performed. See H. R. Rep., at 3; Hearing on Depictions of Animal Cruelty 27.) To the extent that § 48 reaches such persons, it surely does not violate the First Amendment.
Second, the criminal acts shown in crush videos cannot be prevented without targeting the conduct prohibited by §48 — the creation, sale, and possession for sale of depictions of animal torture with the intention of realizing a commercial profit. The evidence presented to Congress posed a stark choice: Either ban the commercial exploitation of crush videos or tolerate a continuation of the criminal acts that they record. Faced with this evidence, Congress reasonably chose to target the lucrative crush video market.
Finally, the harm caused by the underlying crimes vastly outweighs any minimal value that the depictions might conceivably be thought to possess. Section 48 reaches only the actual recording of acts of animal torture; the statute does not apply to verbal descriptions or to simulations. And, unlike the child pornography statute in Ferber or its federal counterpart, 18 U. S. C. §2252, § 48(b) provides an exception for depictions having any “serious religious, political, scientific, educational, journalistic, historical, or artistic value.”
It must be acknowledged that § 48 differs from a child pornography law in an important respect: Preventing the abuse of children is certainly much more important than preventing the torture of the animals used in crush videos. It was largely for this reason that the Court of Appeals concluded that Ferber did not support the constitutionality of § 48. 533 F. 3d, at 228 (“Preventing cruelty to animals, although an exceedingly worthy goal, simply does not implicate interests of the same magnitude as protecting children from physical and psychological harm”). But while protecting children is unquestionably more important than protecting animals, the *496 Government also has a compelling interest in preventing the torture depicted in crush videos.
The animals used in crush videos are living creatures that experience excruciating pain. Our society has long banned such cruelty, which is illegal throughout the country. In Ferber, the Court noted that “virtually all of the States and the United States have passed legislation proscribing the production of or otherwise combating 'child pornography/ ” and the Court declined to “second-guess [that] legislative judgment.”[6] 458 U. S., at 758. Here, likewise, the Court of Appeals erred in second-guessing the legislative judgment about the importance of preventing cruelty to animals.
Section 48’s ban on trafficking in crush videos also helps to enforce the criminal laws and to ensure that criminals do not profit from their crimes. See 145 Cong. Ree. 25897 (1999) (Rep. Gallegly) (“The state has an interest in enforcing its existing laws. Right now, the laws are not only being violated, but people are making huge profits from promoting the violations”); id., at 10685 (1999) (same) (explaining that he introduced the House version of the bill because “criminals should not profit from [their] illegal acts”). We have already judged that taking the profit out of crime is a compelling interest. See Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd., 502 U. S. 105, 119 (1991).
In short, Ferber is the case that sheds the most light on the constitutionality of Congress’ effort to halt the production of crush videos. Applying the principles set forth in Ferber, I would hold that crush videos are not protected by the First Amendment.
*497 B
Application of the Ferber framework also supports the constitutionality of §48 as applied to depictions of brutal animal fights. (For convenience, I will focus on videos of dogfights, which appear to be the most common type of animal fight videos.)
First, such depictions, like crush videos, record the actual commission of a crime involving deadly violence. Dogfights are illegal in every State and the District of Columbia, Brief for United States 26-27, and n. 8 (citing statutes), and under federal law constitute a felony punishable by imprisonment for up to five years, 7 U. S. C. § 2156 et seq. (2006 ed. and Supp. II); 18 U. S. C. §49 (2006 ed., Supp. II).
Second, Congress had an ample basis for concluding that the crimes depicted in these videos cannot be effectively controlled without targeting the videos. Like crush videos and child pornography, dogfight videos are very often produced as part of a “low-profile, clandestine industry,” and “the need to market the resulting products requires a visible apparatus of distribution.” Ferber, 458 U. S., at 760. In such circumstances, Congress had reasonable grounds for concluding that it would be “difficult, if not impossible, to halt” the underlying exploitation of dogs by pursuing only those who stage the fights. Id., at 759-760; see 533 F. 3d, at 246 (Cowen, J., dissenting) (citing evidence establishing “the existence of a lucrative market for depictions of animal cruelty,” including videos of dogfights, “which in turn provides a powerful incentive to individuals to create [such] videos”).
The commercial trade in videos of dogfights is “an integral part of the production of such materials,” Ferber, supra, at 761. As the Humane Society explains, “[videotapes memorializing dogfights are integral to the success of this criminal industry” for a variety of reasons. Humane Society Brief 5. For one thing, some dogfighting videos are made “solely for the purpose of selling the video (and not for a live audience).” Id., at 9. In addition, those who stage dogfights profit not just from the sale of the videos themselves, but from the *498 gambling revenue they take in from the fights; the videos “encourage [such] gambling activity because they allow those reluctant to attend actual fights for fear of prosecution to still bet on the outcome.” Ibid.; accord, Brief for Center on the Administration of Criminal Law as Amicus Curiae 12 (“Selling videos of dogfights effectively abets the underlying crimes by providing a market for dogfighting while allowing actual dogfights to remain underground”); ibid. (“These videos are part of a ‘lucrative market’ where videos are produced by a ‘bare-boned, clandestine staff’ in order to permit the actual location of dogfights and the perpetrators of these underlying criminal activities to go undetected” (citation omitted)). Moreover, “[v]ideo documentation is vital to the criminal enterprise because it provides proof of a dog’s fighting prowess — proof demanded by potential buyers and critical to the underground market.” Humane Society Brief 9. Such recordings may also serve as “ ‘training’ videos for other fight organizers.” Ibid. In short, because videos depicting live dogfights are essential to the success of the criminal dogfighting subculture, the commercial sale of such videos helps to fuel the market for, and thus to perpetuate the perpetration of, the criminal conduct depicted in them.
Third, depictions of dogfights that fall within § 48’s reach have by definition no appreciable social válue. As noted, § 48(b) exempts depictions having any appreciable social value, and thus the mere inclusion of a depiction of a live fight in a larger work that aims at communicating an idea or a message with a modicum of social value would not run afoul of the statute.
Finally, the harm caused by the underlying criminal acts greatly outweighs any trifling value that the depictions might be thought to possess. As the Humane Society explains;
“The abused dogs used in fights endure physical torture and emotional manipulation throughout their lives to *499 predispose them to violence; common tactics include feeding the animals hot peppers and gunpowder, prodding them with sticks, and electrocution. Dogs are conditioned never to give up a fight, even if they will be gravely hurt or killed. As a result, dogfights inflict horrific injuries on the participating animals, including lacerations, ripped ears, puncture wounds and broken bones. Losing dogs are routinely refused treatment, beaten further as ‘punishment’ for the loss, and executed by drowning, hanging, or incineration.” Id., at 5-6 (footnotes omitted).
For these dogs, unlike the animals killed in crush videos, the suffering lasts for years rather than minutes. As with crush videos, moreover, the statutory ban on commerce in dogfighting videos is also supported by compelling governmental interests in effectively enforcing the Nation’s criminal laws and preventing criminals from profiting from their illegal activities. See Ferber, supra, at 757-758; Simon & Schuster, 502 U. S., at 119.
In sum, §48 may validly be applied to at least two broad real-world categories of expression covered by the statute: crush videos and dogfighting videos. Thus, the statute has a substantial core of constitutionally permissible applications. Moreover, for the reasons set forth above, the record does not show that §48, properly interpreted, bans a substantial amount of protected speech in absolute terms. A fortiori, respondent has not met his burden of demonstrating that any impermissible applications of the statute are “substantial” in relation to its “plainly legitimate sweep.” Williams, 553 U. S., at 292. Accordingly, I would reject respondent’s claim that § 48 is facially unconstitutional under the overbreadth doctrine.
* * *
For these reasons, I respectfully dissent.
*500 APPENDIX
As the following chart makes clear, virtually all state laws prohibiting animal cruelty either expressly define the term “animal” to exclude wildlife or else specifically exempt lawful hunting activities.
Alaska Alaska Stat. § 11.61.140(c)(4) (2008) (“It is a defense to a prosecution under this section that the conduct of the defendant... was necessarily incidental to lawful fishing, hunting or trapping activities”)
Arizona Ariz. Rev. Stat. Ann. §§ 13-2910(0(1), (3) (West Supp. 2009) (“This section does not prohibit or restrict . . . [t]he taking of wildlife or other activities permitted by or pursuant to title 17 ... [or] [activities regulated by the Arizona game and fish department or the Arizona department of agriculture”)
Arkansas Ark. Code Ann. §5-62-105(a) (Supp. 2009) (“This sub-chapter does not prohibit any of the following activities: ... (9) Engaging in the taking of game or fish through hunting, trapping, or fishing, or engaging in any other activity authorized by Arkansas Constitution, Amendment 35, by § 15-41-101 et seq., or by any Arkansas State Game and Fish Commission regulation promulgated under either Arkansas Constitution, Amendment 35, or statute”)
California Cal. Penal Code Ann. §599c (West 1999) (“No part of this title shall be construed as interfering with any of the laws of this state known as the ‘game laws,’ . . . or to interfere with the right to kill all animals used for food”)
Colorado Colo. Rev. Stat. Ann. § 18-9-201.5(2) (2009) (“In case of any conflict between this part 2 [prohibiting cruelty to animals] or section 35-43-126, [Colo. Rev. Stat.], and section 35-43-126, [Colo. Rev. Stat.], and the wildlife statutes of the state, said wildlife statutes shall control”), § 18-9-202(3) (“Nothing in this part 2 shall be construed to amend or in any manner change the authority of the wildlife commission, as established in title 33, [Colo. Rev. Stat.], or to prohibit any conduct therein authorized or permitted”)
*501 Connecticut Conn. Gen. Stat. § 53-247(b) (2009) (“Any person who maliciously and intentionally maims, mutilates, tortures, wounds or kills an animal shall be fined not more than five thousand dollars or imprisoned not more than five years or both. The provisions of this subsection shall not apply to . . . any person . . . while lawfully engaged in the taking of wildlife”)
Delaware Del. Code Ann., Tit. 11, § 1325(f) (2007) (“This section shall not apply to the lawful hunting or trapping of animals as provided by law”)
Florida Fla. Stat. §828.122(9)(b) (2007) (“This section shall not apply to . . . [a]ny person using animals to pursue or take wildlife or to participate in any hunting regulated or subject to being regulated by the rules and regulations of the Fish and Wildlife Conservation Commission”)
Georgia Ga. Code Ann. § 16-12-4(e) (2007) (“The provisions of this Code section shall not be construed as prohibiting conduct which is otherwise permitted under the laws of this state or of the United States, including, but not limited to . . . hunting, trapping, fishing, [or] wildlife management”)
Hawaii Haw. Rev. Stat. §711-1108.5(1) (2008 Cum. Supp.) (“A person commits the offense of cruelty to animáis in the first degree if the person intentionally or knowingly tortures, mutilates, or poisons or causes the torture, mutilation, or poisoning of any pet animal or equine animal resulting in serious bodily injury or death of the pet animal or equine animal”)
Idaho Idaho Code §25-3515 (Lexis 2000) (“No part of this chapter shall be construed as interfering with, negating or preempting any of the laws or rules of the department of fish and game of this state... or to interfere with the right to kill, slaughter, bag or take all animals used for food”)
Illinois Ill. Comp. Stat., ch. 510, §70/13 (West 2006) (“In ease of any alleged conflict between this Act . . . and the ‘Wildlife Code of Illinois’ or ‘An Act to define and require the use of humane methods in the handling, preparation for slaughter, and slaughter of livestock for meat or meat products to be offered for sale',... the provisions of those Acts shall prevail” (footnotes omitted)), §70/3.03(b)(l) (“For the purposes of this Section, *502 'animal torture’ does not include any death, harm, or injury caused to any animal by... any hunting, fishing, trapping, or other activity allowed under the Wildlife Code, the Wildlife Habitat Management Areas Act, or the Fish and Aquatic Life Code” (footnotes omitted))
Indiana Ind. Code § 35-46-3-5(a) (West 2004) (subject to certain exceptions not relevant here, “this chapter [prohibiting “Offenses Relating to Animals”] does not apply to ... [f]ishing, hunting, trapping, or other conduct authorized under [Ind. Code §] 14-22”)
Iowa Iowa Code §717B.2(5) (2009) (“This section [banning ‘animal abuse’] shall not apply to . .. [a] person taking, hunting, trapping, or fishing for a wild animal as provided in chapter 481A”), § 717B.3A(2)(e) (“This section [banning ‘animal torture’] shall not apply to ... [a] person taking, hunting, trapping, or fishing for a wild animal as provided in chapter 481A”)
Kansas Kan. Stat. Ann. § 21-4310(b)(3) (2007) (“The provisions of this section shall not apply to . . . killing, attempting to kill, trapping, catching or taking of any animal in accordance with the provisions of chapter 32 [Wildlife, Parks and Recreation] or chapter 47 [Livestock and Domestic Animals] of the Kansas Statutes Annotated”)
Kentucky Ky. Rev. Stat. Ann. §§ 525.130(2)(a), (e) (Lexis 2008) (“Nothing in this section shall apply to the killing of animals ... [p]ursuant to a license to hunt, fish, or trap . .. [or] [f]or purposes relating to sporting activities”), § 525.130(3) (“Activities of animals engaged in hunting, field trials, dog training other than training a dog to fight for pleasure or profit, and other activities authorized either by a hunting license or by the Department of Fish and Wildlife shall not constitute a violation of this section”)
Louisiana La. Rev. Stat. Ann. § 14:102.1(C)(1) (West Supp. 2010) (“This Section shall not apply to ... [t]he lawful hunting or trapping of wildlife as provided by law”)
Maine Me. Rev. Stat. Ann., Tit. 17, §1031(1)(G) (West Supp. 2009) (providing that hunting and trapping an animal is not a form of prohibited animal cruelty if “permitted pursuant to” parts of state code regulating the shooting of large game, inland fisheries, and wildlife)
Maryland Md. Crim. Law Code Ann. §10-603(3) (Lexis 2002) (“Sections 10-601 through 10-608 of this subtitle do
*503 Michigan Mich. Comp. Laws Ann. §§ 750.50(ll)(a), (b) (West Supp. 2009) (“This section does not prohibit the lawful killing or other use of an animal, including... [fishing . . . [h]unting, [or] trapping [as regulated by state law]”), §§ 750.50b(9)(a), (b) (“This section does not prohibit the lawful killing of an animal pursuant to . . . [fBshing . . . [hjunting, [or] trapping [as regulated by state law]”)
Missouri Mo. Rev. Stat. §578.007(3) (2000) (“The provisions of sections 578.005 to 578.023 shall not apply to... [hjunting, fishing, or trapping as allowed by” state law)
Montana Mont. Code Ann. §45-8-211(4)(d) (2009) (“This section does not prohibit... lawful fishing, hunting, and trapping activities”)
Nebraska Neb. Rev. Stat. §28-1013(4) (2008) (exempting “[e]ommonly accepted practices of hunting, fishing, or trapping”)
Nevada Nev. Rev. Stat. §§574.200(1), (3) (2007) (provisions of Nevada law banning animal cruelty “do not... [ijnterfere with any of the fish and game laws . . . [or] the right to kill all animals and fowl used for food”)
New Hampshire N. H. Rev. Stat. Ann. § 644:8(11) (West Supp. 2009) (“In this section, ‘animal’ means a domestic animal, a household pet or a wild animal in captivity”)
New Jersey N. J. Stat. Ann. § 4:22-16(c) (West 1998) (“Nothing contained in this article shall be construed to prohibit or interfere with .. . [t]he shooting or taking of game or game fish in such manner and at such times as is allowed or provided by the laws of this State”)
New Mexico N. M. Stat. Ann. §30-18-l(I)(D (Supp. 2009) (“The provisions of this section do not apply to ... fishing, hunting, falconry, taking and trapping”)
New York N. Y. Agrie. & Mkts. Law Ann. §353-a(2) (West 2004) (“Nothing contained in this section shall be construed to prohibit or interfere in any way with anyone lawfully engaged in hunting, trapping, or fishing”)
North Carolina N. C. Gen. Stat. Ann. § 14-360(c)(l) (Lexis 2009) (“[TJhis section shall not apply to... [t]he lawful taking of animals under the jurisdiction and regulation of the Wildlife Resources Commission ... ”) not apply to... an activity that may cause unavoidable physical pain to an animal, including ... hunting, if the person performing the activity uses the most humane method reasonably available”)
*504 North Dakota N. D. Cent. Code Ann. §36-21.1-01(5)(a) (Lexis Supp. 2009) (“‘Cruelty’ or ‘torture’.. . does not include .. . [a]ny activity that requires a license or permit under chapter 20.1-03 [which governs gaming and other licenses]”)
Oregon Ore. Rev. Stat. §167.335 (2007) (“Unless gross negligence can be shown, the provisions of [certain statutes prohibiting animal cruelty] do not apply to . . . (7) [l]awful fishing, hunting and trapping activities”)
Pennsylvania 18 Pa. Cons. Stat. §5511(a)(3)(ii) (2008) (“This subsection [banning killing, maiming, or poisoning of domestic animals or zoo animals] shall not apply to... the killing of any animal or fowl pursuant to ... The Game Law”), § 5511(c)(1) (“A person commits an offense if he wantonly or cruelly illtreats, overloads, beats, otherwise abuses any animal, or neglects any animal as to which he has a duty of care”)
Rhode Island R. I. Gen. Laws §4-l-3(a) (Lexis 1998) (prohibiting “[e]very owner, possessor, or person having the charge or custody of any animal” from engaging in certain acts of unnecessary cruelty), §§4-l-5(a), (b) (prohibiting only “[mjalidous” injury to or killing of animals and further providing that “[t]his section shall not apply to licensed hunters during hunting season or a licensed business killing animals for human consumption”)
South Carolina S. C. Code Ann. §47-1-40(0 (Supp. 2009) (“This section does not apply to . .. activity authorized by Title 50 [consisting of laws on Fish, Game, and Watercraft]”)
South Dakota S. D. Codified Laws §40-1-17 (2004) (“The acts and conduct of persons who are lawfully engaged in any of the activities authorized by Title 41 [Game, Fish, Parks and Forestry] . . . and persons who properly kill any animal used for food and sport hunting, trapping, and fishing as authorized by the South Dakota Department of Game, Fish and Parks, are exempt from the provisions of this chapter”)
Tennessee Tenn. Code Ann. §39-14-201(1) (2010 Supp.) (“‘Animal’ means a domesticated living creature or a wild creature previously captured”), §39-14-201(4) (“[N]othing in this part shall be construed as prohibiting the shooting of birds or game for the purpose of human food or the use of animate targets by incorporated gun clubs”)
Texas Tex. Penal Code Ann. § 42.092(a)(2) (West Supp. 2009) (“‘Animal’ means a domesticated living creature, in- *505 eluding any stray or feral cat or dog, and a wild living creature previously captured. The term does not include an uncaptured wild living creature or a livestock animal”), § 42.092(f)(1)(A) (“It is an exception to the application of this section that the conduct engaged in by the actor is a generally accepted and otherwise lawful . . . form of conduct occurring solely for the purpose of or in support of . . . fishing, hunting, or trapping”)
Utah Utah Code Ann. § 76-9-301(l)(b)(ii)(D) (Lexis 2008) (“‘Animal’ does not include . . . wildlife, as defined in Section 23-13-2, including protected and unprotected wildlife, if the conduct toward the wildlife is in accordance with lawful hunting, fishing, or trapping practices or other lawful practices”), § 76-9-301(9)(C) (“This section does not affect or prohibit... the lawful hunting of, fishing for, or trapping of, wildlife”)
Vermont Vt. Stat. Ann., Tit. 13, §851b(l) (2009) (“This subchapter shall not apply to . . . activities regulated by the department of fish and wildlife pursuant to Part 4 of Title 10”)
Virginia Va. Code Ann. §3.2-6570(D) (Lexis 2008) (“This section shall not prohibit authorized wildlife management activities or hunting, fishing or trapping [as regulated by state law]”)
Washington Wash. Rev. Code §16.52.180 (2008) (“No part of this chapter shall be deemed to interfere with any of the laws of this state known as the ‘game laws’... or to interfere with the right to kill animals to be used for food”)
West Virginia W. Va. Code Ann. § 61-8-19(f) (Lexis Supp. 2009) (“The provisions of this section do not apply to lawful acts' of hunting, fishing, [or] trapping”)
Wisconsin Wis. Stat. §951.015(1) (2007-2008) (“This chapter may not be interpreted as controverting any law regulating wild animals that are subject to regulation under ch. 169 [regulating, among other things, hunting], [or] the taking of wild animals”)
Wyoming Wyo. Stat. Ann. § 6-3-203(m)(iv) (2009) (“Nothing in subsection (a), (b) or (n) of this section shall be construed to prohibit... [t]he hunting, capture or destruction of any predatory animal or other wildlife in any manner not otherwise prohibited by law”)

 Respondent argued at length that the evidence was insufficient to prove that the particular videos he sold lacked any serious scientific, educational, or historical value and thus fell outside the exception in § 48(b). See Brief for Appellant in No. 05-2497 (CA3), pp. 72-79. He added that, if the evidence in this case was held to be sufficient to take his videos outside the scope of the exception, then “this case presents... a situation” in which “a constitutional violation occurs.” Id., at 71. See also id., at 47 (“The applicability of 18 U. S. C. § 48 to speech which is not a crush video or an appeal to some prurient sexual interest constitutes a restriction of protected speech, and an unwarranted violation of the First *483 Amendment’s free speech guarantee”); Brief for Respondent 55 (“Stevens’ speech does not fit within any existing category of unprotected, prosecutable speech”); id,., at 57 (“[T]he record as a whole demonstrates that Stevens’ speech cannot constitutionally be punished”). Contrary to the Court, ante, at 473, n. 3 (citing 533 P. 3d 218, 231, n. 13 (CA3 2008) (en bane)), I see no suggestion in the opinion of the Court of Appeals that respondent did not preserve an as-applied challenge.

 For the reasons set forth below, this is not a case in which the challenged statute is unconstitutional in all or almost all of its applications.

 See Appendix, infra (citing statutes); B. Wagman, S. Waisman, & P. Fraseh, Animal Law: Cases and Materials 92 (4th ed. 2010) (“Most anti-cruelty laws also include one or more exemptions,” which often “exclud[e] from coverage (1) whole classes of animals, such as wildlife or farm animals, or (2) specific activities, such as hunting”); Note, Economics and Ethics in the Genetic Engineering of Animals, 19 Harv. J. L. & Tech. 413, 432 (2006) (“Not surprisingly, state laws relating to the humane treatment of wildlife, including deer, elk, and waterfowl, are virtually non-existent”).

 Webster’s Third New International Dictionary 2073 (1976); Random House Dictionary of the English Language 1303 (1966). While the term “serious” may also mean “weighty” or “important,” ibid., we should adopt the former definition if necessary to avoid unconstitutionality.

 Since the Court has taken pains not to decide whether §48 would be unconstitutional as applied to graphic dogfight videos, including those depicting fights occurring in countries where dogfighting is legal, I take it that the Court does not intend for its passing reference to cockfights to mean either that all depictions of cockfights, whether legal or illegal under local law, are protected by the First Amendment or that it is impermissible to ban the sale or possession in the States of a depiction of a legal cockfight in Puerto Rico.

 In other cases, we have regarded evidence of a national consensus as proof that a particular government interest is compelling. See Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd., 502 U. S. 105, 118 (1991) (State’s compelling interest “in ensuring that victims of crime are compensated by those who harm them” evidenced by fact that “[e]very State has a body of tort law serving exactly this interest”); Roberts v. United States Jaycees, 468 U. S. 609, 624-625 (1984) (citing state laws prohibiting discrimination in public accommodations as evidence of the compelling governmental interest in ensuring equal access).